# Exhibit A

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

LEVEL ONE TECHNOLOGIES, INC.,    )
    )
        Plaintiff,    )    Cause No.
    )
v.    )    Division No.
    )
PENSKE TRUCK LEASING CO., L.P.,    )    JURY TRIAL DEMANDED
    )
Serve at:    )
    )
Corporation Service Company    )
221 Bolivar Street    )
Jefferson City, Missouri 65101    )
    )
And    )
    )
PENSKE LOGISTICS, LLC    )
    )
Serve at:    )
Corporation Service Company    )
221 Bolivar Street    )
Jefferson City, Missouri 65101    )
    )
        Defendants    )

**19**

## PETITION

As and for its Petition against the above-named Defendants, Plaintiff Level One

Technologies, Inc. ("Level One"), hereby states as follows:

### PARTIES, JURISDICTION AND VENUE

1.    Plaintiff, Level One Technologies, Inc. is a Missouri corporation, in good

standing, with its principal place of business located in St. Louis County, Missouri.

2.    Upon information and belief, Penske Truck Leasing Co., L.P., ("Penske Truck

Leasing") is a Delaware limited partnership whose general partner is Penske Truck Leasing

Corporation, and whose limited partners are General Electric Credit Corporation of Tennessee,

Penske Automotive Group, and Penske Truck Leasing Corporation.  Penske Truck Leasing is registered to do business in the State of Missouri.

3.     Upon information and belief, Penske Logistics LLC ("Penske Logistics") is a Delaware limited liability company that is a wholly owned subsidiary of Penske Truck Leasing, and is registered to do business in the State of Missouri, and is conducting business in the State of Missouri.

4.     Venue is proper in this Court pursuant to Mo. Rev. Stat. § 508.010.

5.     Penske Logistics and Penske Truck Leasing do business as, by and through, and as representatives and agents of each other, and their respective owners and their respective subsidiaries and affiliates (including Penske Logistics Europe, a/k/a Penske Logistics B.V., and Penske Logistics Mexico.)

6.     Penske Logistics, Europe, a/k/a Penske Logistics B.V. and Penske Logistics Mexico also do business as, by and through and as agents or representatives of Penske Logistics and Penske Truck Leasing.

7.     The Defendants transact business both directly and through their instrumentalities, agents, collaborators, joint ventures and nominees in Saint Louis County, State of Missouri.

8.     All actions and inactions taken by Penske Logistics, Penske Truck Leasing, their respective owners and their respective subsidiaries and affiliates (including Penske Logistics Europe, and Penske Logistics Mexico) described and alleged herein were taken:

   a.     on behalf of themselves, and each other;

   b.     as agents or representatives of each other;

   c.     pursuant to a joint venture, joint business enterprise, and common business design and plan intended to, and which did, benefit all of them; and/or

2

    d.    as alter egos or instrumentalities of each other.

9.    Penske Logistics, Penske Truck Leasing, their respective owners and their respective subsidiaries and affiliates (including Penske Logistics Europe, and Penske Logistics Mexico) are each jointly and severally liable for the actions of the other.

10.    Hereinafter, except for where delineated separately by their individual names, Penske Logistics, Penske Truck Leasing, and their respective owners and their respective subsidiaries and affiliates (including Penske Logistics Europe, and Penske Logistics Mexico) shall be jointly and collectively referred to as "Penske"

11.    This Court has personal jurisdiction over the Defendants in that each is transacting, or is otherwise conducting business, throughout the State of Missouri and specifically in St. Louis County, entered into the contracts here in issue in St Louis County Missouri intending them to be performed in Missouri, and that each of the torts, or wrongful acts, were taken in or had their effect felt in St. Louis County, and moreover each of the Defendant's respective acts, alleged herein, were taken with the knowledge and intent that said acts would have an effect on and in St. Louis County, State of Missouri.

12.    The Defendants have promoted and/or advertised, marketed and solicited business, and have conducted and transacted business and sales in the State of Missouri, and specifically, St. Louis County, and have knowingly placed goods and/or services into the stream of commerce, with the knowledge and intent that they would be sold and/or undertaken in the State of Missouri.

13.    The agreements referenced herein, were entered into in St. Louis County, Missouri, and provide that Missouri law will govern.

3

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### *Level One's Protected Expertise and Knowledge*

14.     Beginning in the mid to late 1990's, Level One began a multiyear iterative development process to conceive of and develop unique solutions to certain problems then prevalent in the billing relationships within the trucking and logistic industries, and to mesh those solutions with other proprietary techniques and methods to create an integrated, but flexible, electronic system that would emulate the workflow of a paper-based freight bill audit and payment system, but reduce the time and cost of creating, sending, accepting, receiving, auditing, approving and paying freight bills.

15.     As a result of Level One's substantial investment of time and resources, original thinking, inventiveness and expertise, Level One successfully developed, refined, and is continuing to refine as of this date, a payment management and facilitation system which allows its users to integrate their own management and accounting programs into the system and facilitates the exchange of electronic invoices, the resolution of billing disputes, the offering of specialized discounts and payment terms, the exchange of delivery documents between transportation providers and their carriers and their customers, and the making and receipt of payments.

16.     In order to develop, implement and periodically improve, modify and update its system, Level One developed and applied, and continues to develop and apply, knowledge, expertise, systems and methodologies relating to the invoicing and payment systems of the trucking and logistics industries, including knowledge, expertise, systems and methodologies relating to billing, planning, invoicing, payments, inter- and intra-company communications and the creation, exchange, acceptance, approval, and payment of transactions.

4

17.     In 2004, Level One began taking steps to monetize the results of the time, money and other resources it had invested, and was continuing to invest, to develop its system.

18.     To do so, Level One developed and updated, and continues to develop and update, a software application known as "Epay Manager" which provides a web-based, virtual "universe" of private networks within which Level One would, did, and does allow those to whom Level One grants access ("Members") to utilize Level One's methodologies and system for invoice presentment, payment processing and related activities and transactions.  Members include such businesses as direct shippers, freight brokers, third party logistics providers, trucking companies, etc.

19.     Prior to Level One, no other company had developed an automated solution for the transportation industry that was able to allow industry participants to efficiently resolve and pay an invoice that was created by the payer in a web-based private network and sent to and disputed by the carrier, because of the issues caused by unanticipated line haul or ancillary charges. In addition, no other provider had developed a solution to collect, match and link a carrier's documents, without human intervention, to an electronic invoice created by the payer.

20.     Access to Level One's system was and is allowed:

a.     only to Level One Members;

b.     only for specified contractual periods;

c.     only for limited, specified purposes;

d.     upon specified terms; and

e.     in exchange for specified fees.

21.     Access to Level One's system is NOT granted to the general public and the system is not made generally known.

*The Defendants' Promises, Representations and Agreements*

22.    In or around March 2008, Penske, acting through Janet Chladni, approached Level One and indicated that it was interested in determining whether Level One could improve on and/or replace Penske's, then-existing, rudimentary, paper based, and partially outsourced freight payment methodologies and systems.

23.    In response, Level One indicated it believed its system resolved most, if not all, of the difficulties Penske and its customers were facing, and stated it was interested in discussing the opportunity to provide its system to Penske and its customers on certain terms and conditions.

24.    Level One emphasized that its system used information, knowledge, approaches, concepts and mechanisms that Level One considered proprietary and confidential, and that it would only provide Penske with access to its system and the knowledge, information, approaches, concepts, mechanisms, solutions, ideas and methodologies it contained and implemented if Penske agreed that it would not use anything it learned, for any purpose, except to determine whether it should enter into a contract with Level One to use Level One's system and make it available for Penske's own customers.

25.    Penske agreed and the parties began discussing a contract for services.

26.    During the initial discussions, Penske immediately recognized the value of Level One's system and stated it believed Level One's approach would dramatically increase its processing efficiency, reduce its high number of errors, and solve problems for which it had no existing solutions.

27.    Penske also acknowledged that despite its considerable resources, it did not possess the expertise, problem solving ability, or solutions offered by Level One, and admitted

6

that Level One was at least five years ahead of Penske's own ability to develop solutions to the problems with which it was confronted.

28.     Penske then confirmed its interest in going forward with Level One, but stated that before it would enter into a services agreement, it needed to test Level One's system and Level One's implementing software, Epay Manager, to make certain they were scalable and capable of solving Penske's problems and processing all of Penske's transactions, and requested a preliminary "Pilot Program" testing phase..

29.     To convince and induce Level One to allow Penske to conduct a limited "Pilot Program," Penske represented and promised Level One that:

    a.     Penske would use its Pilot Program access to Level One's system, Level One's implementing software, and the knowledge, information, approaches, concepts, mechanisms, solutions, ideas and methodologies of Level One revealed by the system and software, for the sole purpose of determining whether a full services agreement with Level One was feasible, and for no other purpose;

    b.     Penske had no intention of developing its own electronic payment solution, stating that Penske was not a "development company."

    c.     if the Pilot Program was successful, and proved that Level One's system was able to solve Penske's problems and that its implementation through Epay Manager was scalable, Penske would enter into a services agreement with Level One, and would agree to process all of its carrier payable transactions through Level One's system and pay Level One on a per transaction fee basis;

    d.     the current number of transactions which Penske would cause to be processed under the service agreement it would sign with Level One if the Pilot Program was successful

7

was 913,846 transactions a year, and that the volume would increase, over the term of the agreement, based on new customers being added by Penske.

30.     In reliance on the representations and promises of Penske:

a.      Level One agreed to the Pilot Program, in which Penske would have the right to test the Level One system for a period of 60 days, by being granted access to Epay Manager;

b.      Level One agreed to provide such access without compensation or reimbursement from Penske; and

c.      Level One also agreed to allocate numerous hours of programming to support the Pilot Program, and to incur all of the expenses and costs related to the test, including, but not limited to, the cost of training Penske's customer's carriers and Penske's personnel.

31.     The parties began the Pilot Program on May 21, 2008, and Level One provided Penske with access to Epay Manager, and the necessary training for nine (9) designated carriers and Penske's personnel, to try out the Level One system and implementing software for two months, and process a limited number of transactions that Penske estimated to be 650 per week.

32.     The Pilot Program was an overwhelming success and was extended by agreement until November, 2008.

33.     As a result of the success of the Pilot Program, the parties negotiated a five (5) year Services Agreement.

34.     During the Services Agreement negotiations, Penske did not disavow its prior representations set out in paragraph 29 above or indicate in any manner that they were not true and correct, and further represented, promised, acknowledged and agreed that:

a.      Penske and its customers would use Level One's system, Level One's implementing software, and the knowledge, information, approaches, concepts, mechanisms,

8

solutions, ideas and methodologies of Level One revealed by the system and software solely in conjunction with its use of the Level One system for its customer's carrier settlements and related needs during the contractual period, and it would not otherwise use, modify, copy, print, display, reproduce, distribute or publish any information it learned without the express permission of Level One;

      b.    Penske would use Level One's system and Epay Manager, its implementing software, as its sole invoice presentment and payment vehicle in the United States, Mexico, and Europe for all of Penske's freight management and billing customers for the entire contract term;

      c.    The knowledge, services and applications which Level One would provide were those of Level One, and were owned by Level One;

      d.    Level One would receive compensation for the services it would provide to Penske based upon nonrefundable transaction fees and fax and imaging fees, and would be paid additional compensation for any custom programming or other services specifically required and authorized by Penske that were not helpful to other Level One customers;

      e.    Its representation that it would process at least 913,846 transactions a year through the system was still valid, and the customers generating those transactions would be transitioned to Level One's system quickly, with approximately 290,000 being transitioned immediately and the remainder shortly thereafter.

    35.    Penske requested assurances from Level One that it would continue to upgrade, modify and adapt its system and the Epay Manager Implementation software and would continue to address any and all issues that Penske, or any other Level One customer, encountered.

9

36.     Level One entered into the Services Agreement, and agreed to provide Penske access to Level One's system, Level One's implementing software, and the knowledge, information, approaches, concepts, mechanisms, solutions, ideas and methodologies of Level One revealed by the system and software  on the terms of the Services Agreement, in reliance on the promises, representations and nondisclosures of Penske and  it agreed to continue modifying and enhancing its system to meet and/or resolve specific issues or problems.

37.     A true and accurate copy of the Services Agreement, which was signed on November 7, 2008, is attached hereto as Exhibit "A."

38.     Thereafter, in continued reliance on the representations and promises of Penske, and on the Services Agreement, Level One began the task of providing Penske with full access to its Level One's system, Level One's implementing software, and the knowledge, information, approaches, concepts, mechanisms, solutions, ideas and methodologies of Level One revealed by the system and software, by:

a.     discussing its development options and methods with Penske's representatives;

b.     working to make the Epay Manager implementing software available to Penske;

c.     bringing Penske's customers' carriers online; and

d.     training Penske's employees and Penske's customers' carriers to use Level One's system and implementing software.

39.     Penske in turn told Level One it had begun introducing its customers to Level One's system and transitioning them to it.

40.     As discussed above and in more detail below, the  knowledge, information, approaches, concepts, mechanisms, solutions, ideas and methodologies which Level One developed and/or obtained prior to first meeting with Penske, and after its initial meetings with

Penske, were and are protected from use, disclosure, or other exploitation by Penske for several independent, at times overlapping, reasons. Accordingly, the knowledge, information, approaches, concepts, mechanisms, solutions, ideas and methodologies that Level One had developed and has developed are hereafter referred to as "Level One's Protected Knowledge."

41.     Despite what it told Level One, by December of 2008, Penske had not transitioned to the Level One system the approximate 290,000 transactions it had promised would be immediately transferred, and it appeared that the timetable to transition the remaining transactions was moving slower than promised. Level One thus asked for a firm schedule within which all the promised current transactions would be transferred to the Level One system.

42.     On December 30, 2008 Penske confirmed that it had, in fact, unilaterally decided against the immediate transition of its clients to utilize the Level One's system and instead, had adopted a longer, more gradual one year timetable in which it would transition its customer's carriers to the Level One system.

43.     Penske represented, however, that its customers would still be processing the promised volume of transactions through the Level One system by the end of the following year (i.e. by the end of December, 2009) and provided Level One with a transition time table which showed the number of its customer's transactions which would be transferred over each month in 2009).

44.     In reliance on the promises of Penske and the new firm schedule, Level One continued with the relationship with Penske and did not assert its right to enforce the promise to transition the agreed upon volume, the Service Agreement or take other action, and the parties completed the escrow agreement which was envisioned by Services Agreement and signed the

same in January of 2009.  A true and accurate copy of the Escrow Agreement is attached hereto as Exhibit B.

45.     As a consequence of Penske's decision to dramatically slow the transition of its customers, however, the number of transactions processed by Level One in early 2009 fell considerably below the promised levels

46.     Because Level One was paid on a per transaction basis, the slowdown also caused Level One's revenues to fall considerably below the promised payment levels.

47.     Penske then further slowed the transition, such that the monthly transaction promises contained in the December 2008 "revised transition schedule" Penske had provided were also not met.

48.     The slow transition caused Level One's revenue from its Services Agreement with Penske to become out of balance with the costs of the investment and other expenses it had to incur to fulfill its obligations to Penske under the Services Agreement, such as addressing industry issues which Penske highlighted and requested Level One to resolve, and  training and transitioning  Penske's employees and its customers to the Level One system.

49.     Penske continued to promise and represent that it would still transition the full 913,846 transactions to the Level One system (and thus pay the corresponding fees and payments), however, so Level One believed that its low revenues were merely due to a temporarily imbalance caused by mismatched timing between expenses and revenues and believed Penske's promises that all transactions were being transitioned and that revenue would come as projected, just later than anticipated.

50.     Level One thus requested Penske to advance some future payments so as to match cash flow with expenses as originally envisioned.

51.     In response, citing Level One's admitted cash flow imbalance, Penske claimed it felt at risk because, if Level One were to shut down or be unable to fund continued operations, Penske would not be able to instantly transition to a different system.

52.     Penske thus agreed to provide Level One with an advance on future fees only if:

a.      The escrow agreement between the parties, which provided for a third party, neutral escrow agent to hold a safety copy of Level One's implementing software  was modified to eliminate the third party and to allow Penske to assume the role of the escrow agent;

b.      Penske, in the role of escrow agent, would be provided with an actual unencrypted copy of the Epay Manager  software that it could house on its own server; and

c.      Penske would be allowed to continue to use Level One's system, Level One's Protected Information, and Epay Manager, at no charge to Penske, if Level Once ceased operations.

53.     To induce Level One to accept these conditions, Penske represented it would not make any additional copies of the "safety copy" of Epay Manger that it would be entrusted with, that it would still have all of the promised minimum volume of transactions processed through the Level One system (thus providing the promised revenues to Level One) by the end of 2009, and would still ultimately transfer all of its customers to the Level One system, which included bringing Europe and Mexico "on line" as well.

54.     Penske also reaffirmed that it was not seeking to develop its own payment system, but  confirmed again that if it ever decided to do so,  it would not use any of the knowledge, information or solutions learned from its exposure to Level One, Level One's Protected Knowledge,  Level One's system, or Epay Manager.

55.     Penske further represented and agreed that if it ever decided to create its own proprietary system, the new development would be based entirely on information that was known to Penske as of 2009, through either then publically available information about Epay Manager or Penske's own knowledge and experience of "how freight payment is done in the industry, and would not use any information acquired after 2009.

56.     Penske also continued to express its happiness with Level One, and its high regard for Level One's Protected Knowledge and its solutions, to which Penske attributed its greater efficiency, reduced cost and improved relationships with its customer's carriers.

57.     In reliance on the positive statements, representations and promises of Penske, Level One agreed to accept the advance of funds on Penske's terms, and the parties entered into the First Amendment to Services Agreement and Software, Source Code and Data Escrow Agreement ("First Amendment"), on March 27, 2009, a copy of which is attached hereto and incorporated herein as Exhibit C.

58.     Shortly thereafter however, on July 15, 2009, Penske acknowledged it no longer would have the originally promised 913,864 transactions transferred to the Level One system by the end of December, 2009 but rather would only have 464,136 of those transactions transferred but that the remaining transactions, 500,000 transactions, from Europe and Mexico, would be be transitioned during the first six months of 2010 (thus raising the promise to 964,000 from the original 913,864).

59.     On that date, Penske provided Level One with a "newly revised schedule" providing a new promised time frame for transferring transactions to Level Ones system.  This revised schedule claimed that 105,444 transactions had already been transitioned and that an

additional 858,692 transactions would be processed through the Level One system by the end of the second quarter of 2010.

60.    At the same time, Penske also specifically represented that it intended to begin processing its 250,000 Mexican transactions in the first quarter of 2010, and its 250,000 European transactions in the second quarter of 2010.

61.    Three months later, however, on or around October 15, 2009, Penske approached Level One and indicated that it believed it was having difficulty attracting new customers because the transaction fees it wanted to charge were too high, and asked Level One if it would reduce the transaction fees it charged to Penske so that Penske could in turn offer lower rates to prospective new customers.

62.    When Level One noted that its existing fee structure was based on volume levels that Penske had promised but had not yet delivered, Penske again promised that all of its existing volumes would be online by the second quarter of 2010, and asked for a fee reduction with respect to certain prospective customers only.

63.    On or about November 17, 2009, in reliance on the continued promises of Penske, Level One agreed to assist Penske by giving a limited price break for one prospective customer and entered into the Second Amendment to the Services Agreement which implemented that agreement. The Second Amendment also modified the transaction status and/or timing as to when Level One could invoice Penske for its fees. All other provisions of the Services Agreement and the First Amendment were ratified and confirmed by the Parties.

64.    However, contrary to Penske's repeated promises and the "revised schedule" it had provided, by the end of December 2009, Penske still was not processing the promised volume of transactions through Level One.  In fact, Penske processed an average of only 4,745

weekly transactions in Epay Manager, which was only 53% of the revised promise made as recently as July 2009, and even a smaller percentage of the amounts originally promised.

65. Penske responded to inquiries about the continued low volumes by promising that its European and Mexico volume through Level One's system would be substantial and that Europe and Mexico would still be rolled out in the first and second quarters as previously promised, with the delayed domestic volume still to come.

66. In reliance on the continued promises and assurances, Level One continued the extensive investment of time and resources necessary to make the Epay Manager system compatible with Penske's European and Mexican customers so as to give them access to Level One's Protected Knowledge under the agreement with Penske.

67. By the end of the second quarter of 2010, however, Penske had still not transitioned the originally promised domestic volume and had not rolled out Europe or Mexico.

68. Despite these failures, Penske continued to promise to transition its European and Mexican transactions to Epay Manager, and it used these promises to induce Level One to provide more work, and to expose Level One's Protected Knowledge to Penske's European and Mexican operations.

69. Then, in September of 2010, after more than nine (9) months of discussion and planning, Penske transitioned some of its European customers to the Level One system and added them to the Epay Manager environment. However, the European volumes Penske processed were substantially below the 250,000 annual transactions Penske had promised.

70. And, at no time did Penske process any of the 250,000 annual Mexico transactions it promised, despite the fact that it initiated and participated in numerous discussions

16

and planning meetings, during which all structural, organizational and technical barriers to implement the Penske Logistics Mexico transactions were removed or resolved.

71.     Between September 2010 and December 2012, Penske continued to claim that the transitioning of business over to the Level One System was merely delayed but was forthcoming and that Level One would receive the promised revenues and payments; but, in fact, Penske never transitioned the business and never made the promised payments.

*Penske Walks Away From Its Promises, Agreements And Representations*

72.     On December 10, 2012, Penske abruptly changed its tune and informed Level One that it did not intend to transition the originally promised transaction volumes to the Level One System or pay the associated fees and that it would not use Level One's System for all its customers' billing needs as it previously represented and agreed to do, and that it had in fact "begun to develop its own freight bill audit and payment solution. Penske claimed it would cease using Level One's system and implementing software altogether, and transition off the Epay Manager platform, sometime in the second quarter of 2013, despite the fact that the Services Agreement's term had not expired and would not have expired as of the second quarter of 2013.

73.     When Penske informed Level One of its decision, it specifically stated that it had begun development of its new proprietary system in "late 2011"

74.     Then, in or around July of 2013, Level One learned that Penske's admission that it had begun developing its system secretly in late 2011 was not true, and that development of Penske's new platform, named the Penske Online Payment System (POPS) had actually commenced earlier than that, and had already been operational for a significant amount of time, in direct violation of the parties' contract.

75.     Level One also learned that the POPS system implemented, reflected, and utilized at least some, and may utilize most or all, of Level One's Protected Knowledge, despite Penske's lack of right or authority to use Level One's Protected Knowledge in such a system.

76.     Penske and its customers ceased using the Level One system in large part by the end of the second quarter of 2013 as Penske had threatened, and it stopped entering new transactions into the Level One system altogether on December 31, 2013.  Since that date, Penske has entered no new transactions,  despite its contractual agreements with Level One and the fact that the Service Agreement has not expired or been terminated by any party. .

*Penske's Wrongful Acts, Plan and Conspiracy*

77.     Although unknown to Level One at the time,  at some point  Penske entered into, and implemented a plan to steal, misappropriate and usurp:

a.      the results of Level One's substantial investment of time, money and resources to develop its system and Level One's Protected Knowledge;

b.      Level One's  Protected Knowledge, itself, including

i.   the trade secrets and

ii.  non trade secret but proprietary knowledge and information that comprised and comprises Level One's Protected Knowledge; and

c.      other knowledge of Level One which, even if not constituting trade secrets or other proprietary knowledge, was unknown to Penske prior to its dealings with Level One and which Penske was prohibited from using under the contracts it signed with Level One.

78.     Penske either used false statements and false promises to convince Level One to enter into the Pilot Program, Escrow Agreement, Services Agreement and the various amendments as part of the above-noted plan with the intent to never actually comply with its

obligations under those agreements, or it conceived of and implemented such a plan, following the execution of some or all of such agreements notwithstanding their terms and the representations, promises and agreements made in conjunction therewith.

79. Unbeknownst to Level One, as part of this plan and conspiracy, Penske:

a. made the representations and promises set out above, and failed to disclose the information identified above, with the knowledge that the representations were false and/or without any intent to follow through on the promises and representations it made, and/or without knowing whether it would or could follow through on the same;

b. failed and refused to shift all of its customers to Level One, and/or process all of its customer's transactions through Level One's system, as it agreed to do, and failing to process all of the existing transaction volume it promised through the Level One system;

c. took the actions set out above, including delaying the transition of its customers to the Level One system so as to delay and ultimately not pay Level One substantial monies promised under its agreements with Level One;

d. attempted to create a cost/revenue imbalance for Level One to try to weaken Level One financially, after having first convinced Level One to agree to a condition that if Level One were to cease operations Penske would acquire the Level One's Protected Knowledge and Level One's Epay Manager implementing software at no cost;

e. took Level One's Protected Knowledge and used it to develop its own system and implementing software and made it available to its customers, carriers etc., in place of Level One's system; and/or

f. developed the POPS system while still under contract with Level One and while Level One was still processing transactions for Penske.

19

80.     To prevent Level One from realizing Penske's real agenda and activities, and to encourage Level One to continue upgrading, modifying and adapting its Level One's Protected Knowledge and to continue providing it to Penske, Penske continually represented that it was happy with Level One and its Level One's Protected Knowledge, and that it held Level One's development team in high regard, and had no need or desire to consider any other approach or to internally develop software.

81.     Specifically, Penske repeatedly told Level One that thanks to Level One's Protected Knowledge:

   a.     it was happy with its relationship with Level One;

   b.     the relationships between Penske and its customer's carriers had improved and Penske was saving substantial money;

   c.     Penske had lowered its cost of doing business and had greatly enhanced its ability to compete in the logistics and transportation industry;

   d.     Level One's invoice presentment and payment processes was recognized by Penske's carriers as the industry's best practices;

   e.     Penske's processors, for U.S. based transactions, experienced a 50% gain in productivity;

   f.     Penske experienced an 80% reduction in the number of carrier emails requesting information regarding their invoices;

   g.     within eight weeks of implementation, the backlog of Penske's carrier inquiries was reduced from 1,100 to 200;

   h.     Penske was able to implement a 50% reduction in staff size responding to carrier inquires;

i.    Penske showed a 90% improvement in its ability to adapt to new, specific customer/carrier requirements that were previously implemented by custom programming Penske's "I2" management software system, at a significant incremental cost;

j.    carrier acceptance, training, interaction and satisfaction exceeded expectations; and

k.    Penske intended to continue to grow its relationship with Level One, and add additional volumes.

82.    As more fully set forth above and in the specific counts below, Penske:

a.    made significant material promises and representations with no intent to honor the same and has not honored the same;

b.    usurped, stole, implemented and/or attempted to implement most and possibly all of Level One's Protected Knowledge in violation of its contracts and promises and in violation of state, common and statutory laws;

c.    usurped, stole, implemented, and/or attempted to implement trade secrets of Level one;

d.    otherwise violated the terms of the Agreements it signed with Level One; and

e.    is now unfairly competing with Level One.

83.    In addition, Penske has:

a.    failed to deliver the agreed upon volume of transactions, and thus failed to pay the agreed upon amounts under the Services Agreement as amended, thus breaching its obligations to Level One, and causing significant damage to Level One

b.    made false promises without any contemporaneous intent to perform, or without knowledge as to whether they would or could perform, and took the other wrongful acts set

21

forth herein, so as to misappropriate and gain the benefit of Level One's investment of time, money, expertise and resources;

      c.    usurped and misappropriated knowledge gained from Level One with a value as proven at trial; and

      d.    improperly earned revenues from the use of Level One's Protected Knowledge in a competing truck industry payment system and through the development and offering of that system and its POPS software interface to customers, carriers and others, which are properly disgorged to Level One, totaling an amount to be proven at trial.

## COUNT I – FRAUD IN THE INDUCEMENT

84.    Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 83 of this Petition.

85.    In order to induce Level One to enter into its relationship and various agreements with Penske and to provide Penske with initial and then continuing access to the Level One's Protected Knowledge, Penske made the representations set out above in paragraphs 22, 25 and 29 in conjunction with Penske's request to enter into a Pilot Program, the representations set out in paragraph 34 in conjunction with the discussion and negotiation of the Services Agreement, the representations set out in paragraphs 39 and 43 in conjunction with the discussion and negotiations of the Software Source Code and Data Escrow Agreement, and the representations set out in paragraphs 49, 53,54,55 and 56 in conjunction with the discussions and negotiation of the First Amendment to Services Agreement and Software, Source Code and Data Escrow Agreement ("First Amendment")

86.    Penske's representations were false and those constituting promises of future performance were made with the contemporaneous intent not to perform, or were made without

knowledge of their truth or falsity and without knowledge of whether or not the future promises could or would be performed.

87.    Penske also did not disclose its true plan discussed above, and in the discussion and negotiation of each of the agreements noted above did not disclose that the representations it had previously when discussing and negotiating prior agreements were not true, were made with the intent that they would not be performed, and/or were made without knowledge of whether or not they were true or capable of performance.

88.    Level One had no knowledge of Penske's plan and Penske's nondisclosures or the falsity of the representations and each representation and the undisclosed facts were each material, and/or were cumulatively material, and were made with the intent that Level One would rely on the same, and Level One did so to its detriment, by entering into the relationship, and each of the above noted agreements with Penske, investing money and resources in connection therewith, and by providing Penske with access to its Level One's Protected Knowledge.

89.    Level One's reliance on the statements and nondisclosures was reasonable, and was the type of reliance intended by Penske, and caused Level One damage.

90.    In making the false statements and nondisclosures, Penske acted willfully and knowingly, and the representations made were outrageous, because of evil motive and the reckless indifference to Level One and others.

91.    Level One has been damaged by the false representations and promises made by Penske.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor and against the Penske Defendants, jointly and severally on Count I of the

Petition, and to award damages, in an amount as proven at trial in excess of the Court's jurisdictional amount, together with punitive damages sufficient to deter these defendants and others from like conduct, costs and attorneys' fees, pre-judgment and post-judgment interest, and such other and additional relief as this Court deems just and proper.

## COUNT II – NEGLIGENT MISREPRESENTATION

92. Level One restates realleges and incorporates by reference as if fully set forth herein the allegations set forth in paragraphs 1 through 83 of this Petition.

93. In order to induce Level One to enter into its relationship and various agreements with Penske and to provide Penske with initial and then continuing access to the Level One's Protected Knowledge, Penske made the representations set out above in paragraphs 22, 25 and 29 in conjunction with Penske's request to enter into a Pilot Program, the representations set out in paragraph 34 in conjunction with the discussion and negotiation of the Services Agreement, the representations set out in paragraphs 39 and 43 in conjunction with the discussion and negotiation of the Software Source Code and Data Escrow Agreement, and the representations set out in paragraphs 49, 53, 54, 55, and 56 in conjunction with the discussions and negotiation of the First Amendment to Services Agreement and Software, Source Code and Data Escrow Agreement ("First Amendment")

94. Penske's representations were made in the course of its business.

95. Penske's representations were false, and Penske's failure to use reasonable care caused Penske to provide such false information to Level One.

96. Level One's reliance on the statements and nondisclosures was reasonable, and was the type of reliance intended by Penske, and caused Level One damage.

24

97.     Level One had no knowledge of the falsity of the representations and each representation and the undisclosed facts were each material, and/or were cumulatively material, and were made with the intent that Level One would rely on the same, and Level One did so to its detriment, by allowing the Pilot Program, investing money and resources in connection therewith, and by providing Penske with access to its Level One's Protected Knowledge.

98.     Level One has been damaged by the misrepresentations and promises made by Penske.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor and against the Penske Defendants, jointly and severally on Count II of the Petition, and to award damages in an amount as proven at trial but not less than Twenty Five Thousand Dollars ($25,000.00), plus attorneys' fees, pre-judgment and post-judgment interest, the cost of this action and such other and additional relief as this Court deems just and proper.

## COUNT III – BREACH OF SERVICES AGREEMENT, AS AMENDED

99.     Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 83 of this Petition.

100.    The Penske Defendants and Level One entered into a series of agreements with one another as set forth above, including the Services Agreement and the Amendments thereto.

101.    The Service Agreement has never been terminated.

102.    Penske violated and breached their obligations under the Agreement by, *inter alia*:;

a.      failing to utilize Level One's system and the implementing Epay Manager environment for all transactions of all of its customers;

25

b.    failing to timely transition customers to use the Level One's Protected Knowledge and Epay Manager;

c.    Failing to pay Level One the amounts due under the Services Agreement;

d.    developing the POPS application which utilizes and provides access to Level One's Protected Knowledge while Level One was both operational and processing transactions under the Services Agreement with Penske;

e.    using, exploiting, and transferring its knowledge of Level One's Protected Knowledge by using and providing access to such Level One's Protected Knowledge to Penske, its staff, customers and others without the permission or authorization of, or compensation to Level One, by developing Penske's POPS application and otherwise;

f.    making one or more copies of the permitted single copy of Epay Manager's Source Code which was supposed to be housed on Penske's server, but not used or copied unless Level One became non-operational and the Services Agreement was no longer in force

g.    directing its carriers, which were using Level One's system and Epay Manager implementing software under the Services Agreement, to cease doing so, despite still being under the terms of the Services Agreement; and

h.    using "gained knowledge" in a manner prohibited by the Services Agreement as Amended.

1.    The knowledge possessed by Level One and which was unknown to Penske (and which Penske was and is thus prohibited from using to develop a competing approach) included and includes, but is not limited to using the concepts, functions, features, structures, nature, methods, and/or modalities of:

26

a. **Software and Hardware Infrastructure**:

    i.  The Level One Developed Web Based Platform;

    ii.  The Level One Conceived/Developed Hosting Relationships; and

    iii.  The Configured Enterprise Level Hardware Installation

b. **Banking**:

    i.  An ACH Processing Relationship; and

    ii.  Systems to Collect and Store Banking Information .

c. **System Setup**:

    i.  Methods, Protocols and Approaches to System Security;

    ii.  Member Profiles ;

    iii.  Member Rules for Networking ;

    iv.  User Controls ;

    v.  Email Notifications;

    vi.  Flexible Address Features;

    vii.  Dual View Payment Status Lists;

    viii.  Audit Logs;

    ix.  Payment Terms Grids;

    x.  Approval Sequence; and

    xi.  Created Lists and List Functionality.

d. **Member Setup**:

        i.  Payer List;

      ii.  Payer Profile ;

    iii.  Payee List ;

    iv.  Payee Profile;

     v.  Customer List; and

    vi.  Customer Profile .

e.  **Data Management:**

        i.  Interfaces To Import Data from Payer's Operational Software;

      ii.  Conversion of Data; and

    iii.  Data Exports Types To Members' Software.

f.  **Self-Invoicing Model:**

        i.  Communication Functionality;

      ii.  Document Imaging & Indexing ;

    iii.  Rules and Protocols to Govern the Acceptance & Approval of Invoices;

    iv.  Request Change Processes; and

     v.  Protocols built into the Dispute Resolution Process.

g.  **Special Controls:**

        i.  Auto Invoice Controls;

      ii.  Auto Approve Controls ;

    iii.  Functionality to Override Carrier Acceptance;

    iv.  Tariffs/Tolerances;

     v. International Currency & Tax Functionality; and

     vi. Cross Reference Numbers.

h. **Processing Payments**:

     i. Protocols and Systems to Manage ACH Rules & Dates;

     ii. Payment Control; and

     iii. Protocols to Manage Payment Processing.

i. **Reporting**:

     i. Search & Report Functionality.

j. **Distribution List**:

     i. Private Network Distribution List.

103.    Level One has performed its obligations under the Services Agreement as Amended, or would have but for the prior breach or interference of Penske.

104.    The breach of the Agreements between Level One and the Penske Defendants has caused and continues to cause Level One damages, including at least $9,000,000 of lost revenue due to the failure to deliver the agreed upon volumes of traffic and related transaction fees, and the additional damages suffered as a result of the wrongful use of gained knowledge in violation of the agreement.

105.    As set forth above, all Penske Defendants are jointly and severally liable for the obligations under their Agreement with Level One.

106.    However, if for any reason all Defendants are not found to be liable under the Services Agreement, Penske Truck Leasing, as the express signatory to the Agreement, would still be liable under the written document.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor and against the Penske Defendants, jointly and severally on Count III of the Petition, and to award damages, in an amount as proven at trial in excess of $9,000,000.00, plus attorneys' fees, pre-judgment and post-judgment interest, the cost of this action, and such other and additional relief as this Court deems just and proper.

## COUNT IV – MISAPPROPRIATION OF RESULTS OF TIME, RESOUCES AND MONETARY INVESTMENT

107.   Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 106 of this Petition.

108.   In developing the Level One system and the Level One Protected Knowledge contained and revealed by the same, and in specifically focusing on and finding solutions to issues and problems of the logistics industry, Level One spent significant time, effort and money.

109.   Penske is and was aware of, and encouraged the expenditure of time, effort and investment by Level One, and was aware of Level One's intention to be reimbursed for the costs incurred in connection with the services and items provided and rendered.

110.   Penske has taken the proceeds and results of Level One's investment of time, effort and money and utilized it for their own benefit by using the solutions, methodologies, approaches, concepts and ideas of Level One in and to develop POPS, and have refused to pay and/or reimburse Level One for such proceeds.

111.   In so doing, Penske has misappropriated the time, effort and investment of Level One and have damaged Level One in an amount to be determined at trial, but not less than $11,000,000.00.

30

112.    The actions of Penske were intentional, willful and made with the conscious disregard of the rights of Level One.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor and against the Penske Defendants, jointly and severally on Count IV of the Petition, and to award damages, in an amount as proven at trial in excess of the jurisdictional amount, plus attorneys' fees, pre-judgment and post-judgment interest, punitive damages, the cost of this action, and such other and additional relief as this Court deems just and proper.

## COUNT V – HEAD START LIABILITY

113.    Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 112 of this Petition.

114.    As set forth above,  Level One provided information, knowledge, plans, schematics, methodologies and property to Penske for the limited purpose of facilitating the use of the Level One system by Penske and its customers during the contract term in compliance with the contractual terms and conditions.

115.    The use by Penske of that information, knowledge, plans, schematics, methodologies and property to develop its own POPS system was a misuse and/or misappropriation of the same.

116.    Such misuse by Penske allowed it to develop POPS, and caused POPS to become operational much faster than it otherwise would have.

117.    As a result of POPS becoming operational faster, Level One lost profits that it would have otherwise made if POPS would not have been in "production" and Penske earned profits it would not have earned if it had not obtained its improper head start.

31

118.   Penske's actions were willful and made with evil motive and/or the reckless disregard for the rights of others.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor and against the Penske Defendants, jointly and severally on Count V of the Petition, and to award damages including Level One's lost profits,  to disgorge the profits earned by Penske during the "head start period" as determined at trial and award them to Level One, and to award Level One its costs and attorneys' fees, pre-judgment and post-judgment interest, punitive damages, the cost of this action, and such other and additional relief as this Court deems just and proper.

## COUNT VI - FRAUD

119.   Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 118 of this Petition.

120.   In order to induce Level One into continuing to provide access to, and expand , Level One's Protected Knowledge, and to refrain from terminating the Service Agreement, Penske made the representations set forth in sections 58, 59, 60, 62. 65. 68 and 71 above.

121.   Such representations were false and/or those that constituted promises of future performance were made without the contemporaneous intent to perform, or such representations were made without knowledge of their truth or falsity, or without knowledge of whether they were capable of future performance.

122.   Penske also did not disclose that the prior representations made to induce Level One into entering into the Pilot Program, Services Agreement, and the Amendments to Services Agreement were false or incapable of performance.

123.    Penske made these false and material representations to Level One, and did not disclose these material facts with the knowledge that they were false, and with the intention that Level One would rely upon such representations.

124.    Penske's statements and non-disclosures were material, and Level One's reliance on the statements and nondisclosures of Penske was reasonable, and was the type of reliance intended by Penske, and they caused Level One damage.

125.    In making false statements and nondisclosures, Penske acted willfully and knowingly, and the representations it made to Level One were outrageous, and were made with an evil motive and reckless indifference to Level One.

126.    Level One did rely on the promises and representations in the manner Penske envisioned, and Level One did provide the services and incur the costs, for the initial and long-term benefit of the Penske Defendants.

127.    In failing to disclose these material facts and in making the above representations, Penske acted willfully, wantonly, intentionally and with evil motive and with reckless disregard for the rights of Level One.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor and against the Penske Defendants, jointly and severally on Count VI of the Petition, and to award damages, in an amount as proven at trial but not less than this Court's jurisdictional amount, plus attorneys' fees, pre-judgment and post-judgment interest, punitive damages, the cost of this action, and such other and additional relief as this Court deems just and proper.

33

## COUNT VII - NEGLIGENT MISREPRESENTATION

128.   Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 119 of this Petition.

129.   In order to induce Level One into continuing to provide access to, and expand, it's Level One's Protected Knowledge and to refrain from terminating the Service Agreement, Penske made the representations set forth in sections 58, 59, 60 62, 65, 68 and 71 above.

130.   Penske's representations were made in the course of its business.

131.   Penske's representations were false, and Penske failed to use reasonable care to determine if they were truthful before making them.

132.   Such representations were false and/or those that constituted promises of future performance were made without taking care to determine if they could or would be performed and they could not or would not be.

133.   Penske also did not exercise reasonable care to determine whether the prior representations made to induce Level One into entering into the Pilot Program, Services Agreement, and Amendment to Services Agreement were true or capable of performance.

134.   Penske's statements and non-disclosures were material, and Level One's reliance on the statements and nondisclosures of Penske was reasonable, and was the type of reliance intended by Penske, and they caused Level One damage.

135.   Level One did rely on the promises and representations in the manner Penske envisioned, and Level One did provide the services and incur the costs, for the initial and long-term benefit of the Penske Defendants.

136.   Level One had no knowledge of the falsity of the representations and each representation and the undisclosed facts were each material, and/or were cumulatively material,

and were made with the intent that Level One would rely on the same, and Level One did so to its detriment, by entering into the First Amendment, investing money and resources in connection therewith, and by providing Penske with access to its Level One's Protected Knowledge.

137.   Level One has been damaged by the misrepresentations and promises made by Penske.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor and against the Penske Defendants, jointly and severally on Count VII of the Petition, and to award damages, in an amount as proven at trial but not less than this Court's jurisdictional amount, plus attorneys' fees, pre-judgment and post-judgment interest, punitive damages, the cost of this action, and such other and additional relief as this Court deems just and proper.

## COUNT VIII – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

138.   Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 137 of this Petition.

139.   As a result of the verbal Pilot Program Agreement, the written Services Agreement, and the Amendments thereto, and the relationship between the parties, Penske had the duty to act in good faith and to deal fairly with Level One.

140.   Penske's conduct, as outlined above, violated those duties, causing Level One damage as proven at trial.

141.   Penske took these actions with willful disregard, evil motive and/or reckless indifference for the rights of Level One and others.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor, and against the Penske Defendants, jointly and severally on Count VIII of the Petition, and to award damages, in an amount as proven at trial but not less than the Court's jurisdictional amount, plus attorneys' fees, punitive damages, pre-judgment and post-judgment interest, the cost of this action and such other and additional relief as this Court deems just and proper.

## COUNT IX: MISAPPROPRIATION OF TRADE SECRETS

185.    Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 84 of this Petition.

186.    Under the agreements between the Defendants and Level One, and due to the promises and representations of Penske, the Defendants were and are precluded from utilizing the information and knowledge gained from Level One regardless of whether that information would have been entitled to protection if Penske had not entered into those agreements or made such promises and representations.

187.    Accordingly, the actions of the Defendants detailed herein are wrongful and subject them to liability regardless of what other protections the law may provide.

188.    However, a subset of the information gained and now improperly used by Defendants is also protected under Missouri trade secret law, and the use of the same by Defendants is wrongful without regard to any contractual protection or representations and promises of Defendants.

189.    Level One's trade secrets here in issue are the specific concepts, methods and means of implementation which it uses in its system to resolve certain specified issues and problems in the trucking and logistics industries related to billing, invoicing, and payments,

36

inter- and intra- company communications and the creation exchange, acceptance, approval, and payment of electronic transactions. The information, data, systems, techniques, modules, and methods developed by Level One, that are also Trade Secrets are:

    a.    Level One's processes and methods of allowing Payer Members to manage Vendor and Customer relationships;

    b.    Level One's processes and methods of allowing Payer Members to establish specific business rules and financial requirements for their Vendors/Payees;

    c.    Level One's processes and methods that enable Payer Members to view and/or modify the business rules and financial requirements of their Payees;

    d.    Level One's processes and methods that enable Members to communicate with each other, and obtain real time information regarding the current status of transactions;

    e.    Level One's processes and methods to facilitate the prompt resolution of billing disputes;

    f.    Level One's processes and methods to promptly notify payers of a billing dispute;

    g.    Level One's processes and methods to automate the resolution of billing disputes;

    h.    Level One's processes and methods to automate the Payee's acceptance of routine transactions that are rarely disputed by the Payee;

    i.    Level One's processes and methods to reduce the time and cost of approving selected invoices for payment;

j.      Level One's processes and methods that allow Payer Members to maintain orderly control over their Accounts Payable processes, by preventing carriers from delaying the resolution of disputes, by engaging in unsupported or protracted disputes/protests;

k.      Level One's confidential processes and methods of allowing Payer Members to electronically transfer data to and from their management or accounting systems, in order to initiate, manage, approve and pay transactions in a private network, and eliminate the need for either party to have common or compliant software.

190.    Level One's trade secrets derive independent economic value, from the fact that these items are not generally known and are not readily ascertainable by proper means, by other persons, who can obtain economic value from their disclosure or use.

191.    Penske has usurped, copied, stolen, implemented and/or is attempting to implement most and possibly all of Level One's Protected Knowledge and its Trade Secrets, solutions, and/or the methods of implementing those resolutions, in violation of its contracts and promises and in violation of state, common and statutory laws, and is improperly profiting therefrom, and will continue to do so, unless its actions are prevented by this Court.

192.    Level One has taken reasonable efforts to preserve the secrecy of these items, including the use of non-disclosure agreements, confidentiality and non-compete agreements, and contractual terms and conditions which limit the use of the trade secrets.

193.    Penske, as more fully described above, has wrongfully acquired and misappropriated Level One's trade secrets, and has used and is using them in manners and degrees outside the scope of the contractually permitted, limited use provided by an Agreement with Level One, has been and is disclosing them to others and allowing others to use them, and

38

has used them to generate profits for its benefit, and to gain a head start on the development of a payment and related transaction processing system.

194.   Level One has been damaged by the misappropriation of its trade secrets.

195.   Furthermore, Penske has improperly profited from its use of Level One's trade secrets.

196.   Plaintiff is entitled to an award of damages, the disgorgement of Penske's profits, and injunctive relief.

197.   The conduct of the Penske Defendants is outrageous, due to their evil motive and/or reckless indifference to the rights of others, which justifies the imposition of punitive damages.

WHEREFORE Plaintiff, Level One Technologies, Inc., hereby requests this Court to enter a Judgment in its favor and against the Penske Defendants, jointly and severally, on Count IX of the Petition to permanently enjoin Penske and anyone acting by, through or under them, from using the trade secrets of Level One Technologies, and to award Plaintiff its actual damages, disgorge Penske's profits earned in connection with its use of Level One's trade secrets, award punitive damages, and award pre-judgment and post-judgment interest, the cost of this action and such other and additional relief as this Court deems just and proper.

## COUNT X – UNFAIR COMPETITION

198.   Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 197 of this Petition.

199.   Since as early as June of 2013, and upon information and belief substantially earlier, Penske has been utilizing its POPS application to compete with Level One.

200. Such competition is unlawful, unjust and unfair, because Penske has utilized Level One's Protected Knowledge in connection therewith without right or authorization, has intentionally or negligently confused its customers into believing that Penske's POPS application is a version of, similar to, or otherwise affiliated with Level One's Epay Manager implementation software, has switched customers from Level One's system to its own without the customers realization or knowledge, and has caused Level One damages and has improperly profited from such tactics.

201. Such unfair competition has damaged Level One as aforesaid, and has allowed Penske to improperly profit;

202. Level One is entitled to recover its damages as proven at trial, to disgorge Penske's wrongful profits, and to injunctive relief.

203. The actions of Penske were willful and done with evil motive and/or the reckless disregard of the rights of others.

WHEREFORE Plaintiff, Level One Technologies, Inc., hereby requests this Court to enter a Judgment in its favor and against the Penske Defendants, jointly and severally, on Count X of the Petition, and to award Plaintiff its actual damages and assess additional damages in favor of Plaintiff, to disgorge Penske's profits earned from its POPS application or otherwise from its unfair competition, award punitive damages and issue an injunction, prohibiting Penske from utilizing its POPS application, or otherwise using Level Ones Level One's Protected Knowledge, and award pre-judgment and post-judgment interest, the cost of this action and such other and additional relief as this Court deems just and proper.

## COUNT XI – UNJUST ENRICHMENT

204.    Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 203 of this Petition.

205.    As a result of the actions, inactions, violations and conduct of Penske detailed above, Penske has received substantial profits, enhanced reputation, and other benefits.

206.    It would be unjust and unfair, under the circumstances, to allow Penske to retain and enjoy the benefits that have been gained through such improper conduct and/or at the cost and expense of Level One and its employees.

207.    Penske has been unjustly enriched and are justly indebted to Level One for an amount, as proven at trial, of at least the jurisdictional amount.

208.    In engaging in the foregoing conduct, Penske acted willfully, wantonly, and with willful disregard of the rights of Level One and others.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor, and against the Penske Defendants, jointly and severally on Count XI of the Petition, and to award damages in an amount as proven at trial in excess of the jurisdictional amount sufficient to prevent the unjust enrichment of Penske, together with punitive damages, attorneys' fees, pre-judgment and post-judgment interest, the cost of this action and such other and additional relief as this Court deems just and proper.

## COUNT XII – CONSPIRACY

209.    Level One restates realleges and incorporates by reference, as if fully set forth herein, the allegations set forth in paragraphs 1 through 208 of this Petition.

210.    Penske Truck Leasing, Penske Logistics, Penske Logistics Europe B.V., a/k/a Penske Logistics B.V., and Penske Logistics Mexico act together as one entity and as reciprocal agents of each other such that their differing corporate structures are legal fictions and the

monies and assets of each are the same as the other and each purported entity is liable for the wrongdoing of the other, at least in the context of their dealings with Level One.

211.    However, if for any reason they are deemed to be separate entities, then such entities jointly beneficial actions described above and/or proven in this case relating to Level One, the Level One's Protected Knowledge and Epay Manager were taken pursuant to agreements between and among such entities to take the indicated acts for reciprocal and joint benefit.

212.    Such acts were unlawful as noted above.

213.    The actions taken by Penske Truck Leasing and Penske Logistics in connection noted above and/or proved herein were taken to carry out the unlawful purposes noted above, and damaged Level One, in an amount to be proven at trial in excess of the Court's jurisdictional limit.

214.    The actions of Penske Truck Leasing and Penske Logistics, as described herein, were outrageous, because of their evil motive and reckless indifference to the rights of Level One, such that the imposition of punitive damages is warranted.

WHEREFORE Plaintiff Level One Technologies, Inc., hereby requests this Court enter Judgment in its favor, and against the Penske Defendants, jointly and severally, on Count XII of the Petition, and to award damages in an amount as proven at trial, in excess of the Court's jurisdictional limit, attorneys' fees, punitive damages, pre-judgment and post-judgment interest, the cost of this action and such other and additional relief as this Court deems just and proper.

RIEZMAN BERGER, P.C.

By: _____

Charles S. Kramer #34416 (Lead Counsel)
Joseph D. Schneider #57484
Paul A. Grote # 63842
Frederick J. Berger # 25445 (Corporate counsel)
7700 Bonhomme, 7th Floor
St. Louis, Missouri 63105
(314) 727-0101
(314) 727-6458 (fax)
kramer@riezmanberger.com
schneider@riezmanberger.com
grote@riezmanberger.com

43

## SERVICES AGREEMENT

This Services Agreement (this "Agreement") is executed as of this _7th_ day of _November_, 2008 (the "Effective Date") by and between Level One Technologies, Inc. a Missouri corporation ("Level One "), and Penske Truck Leasing Co., L.P. ("Penske"), a Delaware Limited Liability Company.

### RECITALS

A.  Level One offers services and applications for load tendering, document imaging, and electronic payment and presentment of freight bills.

B.  Penske provides supply chain management and logistics services to major industrial and consumer companies throughout the world.

C.  Penske desires to obtain certain services from Level One that will allow Penske to create and send electronic invoices, attach electronic images of proof of delivery to said invoices and initiate electronic transfers of funds between involved parties.

D.  Epay Manager (Epay) is an Internet based load tendering and electronic payment system designed specifically for the transportation industry.  It is a service of Level One and is available online at http://www.epaymanager.com.

### AGREEMENT

1.  **Term.**  The term of this Agreement will commence on the date this agreement is signed by both parties and will continue for 60 Months (the "Initial Term"), unless earlier terminated as provided herein.  At the expiration of the Initial Term, this Agreement will automatically renew for successive terms of two years (each a "Renewal Term") unless notice of non-renewal is given by either party no less than sixty days before expiration of term.  Penske will be deemed to have accepted Level One's then current charges for any successive term unless Penske gives notice to Level One of its rejection of any increase in charges no later than thirty days after Penske receives notice thereof. If Penske rejects any increase in charges, this Agreement shall terminate on the date which is thirty days after Penske gives notice to Level One of its rejection of such increase and during such period prior to termination the previous charges will apply.

2.  **Registration Information.** Penske agrees to provide current, accurate, and complete company, user and banking information and to maintain and promptly update this information as applicable. Penske agrees not to impersonate any person or use a name that you are not authorized to use. If any information you provide is inaccurate, not current, or incomplete, you agree to correct or complete the information immediately after the deficiency is discovered. . Penske authorizes Level One and its subsidiaries, affiliates, agents, employees, and assigns to make any inquiries they consider necessary to validate your registration. Penske agrees to notify Level One immediately of any changes in registration data. Proceeding with the registration process indicates its intent to comply with this Term. Level One will keep your registration information private and confidential. All banking information will be stored on secure and encrypted servers.

3.  **Correct Email.** You agree that you have access to the Internet and to a current email address. You have sole responsibility for providing Level One with a correct and operational email address. Level One will not be liable for any undelivered email communications or any costs you incur for maintaining Internet access and an email account. You must promptly notify Level One of any change in your email or postal mailing address.

4.  **Passwords.** You are solely responsible for maintaining the confidentiality of your Membership password(s), and agree that Level One Technologies, Inc. will have no obligations with regard thereto. You agree not to divulge your Account password(s) to anyone, nor may you use anyone else's password(s). If you believe your password has been lost or stolen or someone has gained access to your password without your permission, call us immediately at 1-800-240-1824 or email us at service@epaymanager.com. No staff member of Level One will ever ask for your password(s) or have any method of obtaining your membership passwords. Every Epay user for your company should have a unique username and password.  Passwords can be reset if they are lost or forgotten.  Our servers will encrypt a temporary password and email it to the email address on file for that member. This temporary password will allow the user to login and require them to change their password.  Level One is not responsible for any losses you incur as a result of your misuse of your Membership password(s).

5.  **Electronic Communications.** To the fullest extent permitted by applicable law, these Terms and Conditions and any other agreements, notices, or other communications regarding your Membership and/or your use of Epay ("Communications") may be provided to you electronically and you agree to receive Communications in an electronic form. Electronic Communications may be posted on the pages within the Epaymanager.com web site and/or delivered to your email address. All Communications in either electronic or paper format will be considered to be in

_Initials_

_Initials_

**EXHIBIT**

_A_

"writing," and to have been received no later than five (5) business days after posting or dissemination, whether or not you have received or retrieved the Communication. Level One reserves the right but assumes no obligation to provide Communications in paper format. Your consent to receive Communications electronically is valid until you revoke your consent by notifying Level One of your decision to do so, by sending an email message to service@epaymanager.com or by calling 1-800-240-1824. If you revoke your consent to receive Communications electronically, Level One shall have the absolute right to terminate your right to use the Epay site.

6.  **Confidentiality.** All proprietary data and information, including but not limited to contract rate information, of Penske obtained by Level One in connection with the use of Epay shall remain the property of Penske and shall be used by Level One solely for its normal use in Epay. Level One acknowledges and agrees that the disclosure of the proprietary information of Penske to Level One does not confer upon Level One any license, interest or rights of any kind in or to the proprietary information. Level One will hold in confidence and not disclose, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose, the proprietary information of Penske or any portion thereof. Level One may disclose the proprietary information only to its attorneys, accountants and employees to the extent such persons have a need to know such information for the purposes of performing the Service Agreement between Level One and Penske.

7.  **Fees.** For the right to complete a transaction through Epay you agree that Level One shall be entitled to a nonrefundable transaction fee (the "Transaction Fee"). The Transaction Fee is one dollar and fifty-five cents (US $1.55) per transaction. For transactions that require Level One to processes Penske's payments through the ACH network, the transaction fee will be adjusted to one dollar and ninety cents (US $1.90) per transaction. The Transaction Fee will be collected electronically on a weekly basis. A failure to pay the weekly Transaction Fee will result in the loss of use of Epay until payment is made. The Transaction Fee includes only the use of the Epay software and does not include the use of the faxing, imaging and posting of payment related documents such as, but not limited to, proof of deliveries, bills of lading, fuel receipts, etc. The fax and imaging service is available for use when needed at a cost of ten cents (US $0.10) per page received. The images will not need to be retained after payment. Fees for use of the fax and imaging service will be collected weekly with the Transaction Fee. For purposes of this Agreement, a fax is defined as a cover sheet from the Epay website and its corresponding documents. The Transaction Fee does not include the electronic settlement of the invoice. Under this agreement Level One will transmit a payment file to Penske for internal processing. Level One is not involved in negotiations between you and your vendors and customers, and any early payment discount(s) that may apply is not required, controlled, or determined by Level One. For your records and verification, the Transaction Fee will appear on the Transaction Summary template and all Payment Status Lists on the website. Custom programming performed by Level One may be subject to additional fees, at the discretion of Level One, and will be mutually agreed upon by all involved parties and Level One prior to the start of programming. Beginning one year after the contract date, Level One may increase all fees subject to the annual percentage limitation stated in the next sentence, by giving at least 60 days prior written notice to Penske. The annual rate of increase during the Initial Term shall not exceed the sum of the annual rate of increase in the United States Consumer Price Index – All Urban Consumers published by the United States Department of Labor, Bureau of Labor Statistics ("CPI") (or a comparable replacement index) during the then most currently available 12 month period. The annual adjustment will be limited to the sum of the full annual CPI adjustment for the first 450,000 transactions processed after the adjustment period plus an amount based on the CPI, with a 1% cap for the remaining number of transactions processed after the adjustment period. After adjustment, the Transaction Fee shall be rounded off to the nearest whole cent.

8.  **Systems Integration.** Level One will provide a standard systems integration with all companies under contract for services through the Epay site. Level One will provide these members with the necessary tools and assistance to facilitate and automated transfer of data from the customer's transportation management system ("TMS") to Epay in order to create and electronic invoice. The integration will also provide a method for the transfer of data from Epay to the customer's TMS to confirm the payment of an invoice and to close an open accounts payable or receivable record. Level One will include, but not limit, the following for most systems integration: XML Document Type Descriptions and sample XML Documents, Client Secure Sockets Layer or Transport Layer Security as needed, programming assistance during implementation, testing and planning, storage of transaction data and delivery documents for a period of no less than three (3) years, and technical support over the application and related gateway. The customer will provide their own staff and any programming necessary to import and/or export the necessary data from their own TMS. Custom programming is available to customers in need of assistance with proprietary systems and will be done at a negotiated rate.

9.  **Processing.** Level One shall make reasonable efforts to ensure that requests for electronic debits and credits involving bank accounts are processed in a timely manner. Epay's payment instructions are sent once a day to Penske for internal payment processing. All transactions must be approved for processing before Penske's daily deadline in order to be processed that day. Because Level

_____ Initials                                                    _____ Initials

One is not processing the payment file through its payment processor, Level One will solely rely on Penske to process the payments as instructed in the daily payment file. Epay will update the status of all transactions in the Epay application to reflect completed payment unless Penske notifies Level One of a different status. All reversals and processing errors will be handled by Penske. A number of factors, several of which are outside of Level One's control, will contribute to when the funds are received. WE MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE AMOUNT OF TIME NEEDED TO COMPLETE PROCESSING, SUCH AS DELAYS IN THE BANKING SYSTEM OR THE U.S. OR INTERNATIONAL MAIL SERVICE, NOR SHALL WE BE LIABLE FOR ANY DAMAGES ARISING FROM ANY CLAIM OF DELAY.

10. **Support and Training.** Level One will provide customer support for Epay free of charge during its normal business hours. Level One's employees will promptly address any questions, problems or concerns from Penske and its carriers. Support requests after hours can be left as a voice mail, emailed to info@epaymanager.com or completed as an online support request at http://www.epaymanager.com/support_request.html. After hours requests will be resolved during the next business day. Penske will receive user training over the telephone at no additional charge. The Penske employees trained by Level One should be key employees who are capable of training other Penske employees as needed. Training sessions can be scheduled in advance with a written request. Additionally, a full suite of training videos is available on Epay. Training will be reserved specifically for the use of Epay and will not include training on other Penske controlled systems or processes as they relate to Epay.

11. **Electronic Transfers.** It is understood that Penske will be responsible for all payment processing, however, in the event Level One processes any payment through Epay, you are requesting an electronic transfer from your bank account. Upon your request, Level One will make electronic transfers via the Epay application to and from your U.S. bank account in the amount you specify, minus any applicable fees. You agree that such requests constitute authorization for such transfers. If you request an electronic transfer from your bank account, you also authorize Level One to confirm your control of your bank account through various methods, including, but not limited to, calling your business' principal, requiring the entry of credit card information, or requiring a forced transfer of a small amount to verify your bank account balance. Your bank account and your Epay Membership will be considered verified once you correctly enter the deposit amounts on the Epay site. The minimum debit amount per transaction is $25.00 and the maximum allowed is $30,000.

12. **Reversal Transactions.** It is understood that Penske will be responsible for all payment processing, including reversal and error handling. In the event Level One becomes the payment processor for any transaction that is reversed for any reason, you will owe Level One for the amount of the reversed transaction. Examples of such a reversal include, but are not limited to, a closed bank account was used, a reversal of the transaction because the sender of the payment was using an unauthorized checking account and the electronic equivalent check returned due to insufficient funds. Level One will seek to recover the funds from you by debiting your account balance and, if there are not sufficient funds in your account balance, you agree that Level One has the right to collect your debt to Level One through a traditional invoice or by any other legal means. You authorize Level One to withdraw any amount deposited by Level One with respect to a reversal transaction in accordance with U.S. Federal Reserve standard terms.

13. **Not a Bank.** You acknowledge that: (i) Epay is not a banking service; (ii) Epay is not insured by any government agency of any nation; and (iii) Epay is not subject to banking regulations.

14. **Penalties.** Level One reserves the right to terminate your Membership if this agreement is violated and with prior written notice.. Level One also reserves the right to charge or impose fines for fees incurred by Level One through users who misuse the Epay site. Termination of your Membership does not remove your responsibility under this agreement to pay all fees incurred up to the date the Membership was canceled including any fees incurred up to the date of termination of the service. If Penske terminates their membership prior to the end of the original term, Penske will owe Level One an Early Termination Penalty. For termination of this Agreement prior to the processing of one hundred thousand transactions or two years of processing time from the effective date of this Agreement, whichever comes first, the Termination Penalty will be one hundred fifty thousand dollars (US $150,000). The Termination Penalty will be waived for the remainder of the initial term once one hundred thousand transactions have been processed or two years of transaction processing time from the effective date of the Agreement have been completed.. Level One reserves the right to terminate a user's Membership for abuse, neglect, fraudulent, or illegal actions at any time with prior written notice.

15. **Arbitration.** Any controversy or claim arising out of or relating to these terms and conditions or the provision of Level One and/or Epay shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Any such controversy or claim shall be arbitrated with any claim or controversy of any other party. The arbitration shall be conducted in St. Louis, Missouri, and judgment on the arbitration award may be entered in any court having jurisdiction thereof. Either you or Level One may seek any interim or preliminary relief from a court of competent jurisdiction in St. Louis, Missouri, necessary to protect the rights or

_____ Initials                                                                    _____ Initials

property of you or Level One (or its subsidiaries, affiliates, agents, employees, and assigns) pending the completion of arbitration.

16. **Site Use and Content.** You may view, copy, or print pages from this site solely for personal, noncommercial purposes. You may not otherwise use, modify, copy, print, display, reproduce, distribute, or publish any information from the sites without the express permission of Level One. At any time Level One may, with notice, make changes to the Epay site or to the online services or products described in the sites. Changes to the Epay site will be classified at three levels; Minor, Intermediate and Major. Changes classified as Minor will not require any testing or approval by Penske and will include, but aren't limited to, minor infrastructure changes, changes to Epay's marketing site, site updates or fixes that do not significantly change the use of the application. Changes classified as Intermediate will require prior notification to Penske and possible testing by Penske's employees and will include, but aren't limited to significant changes to the look and feel of the application, removal of existing data fields and the addition of new data fields. Changes classified as Major will require prior notification to Penske for testing and evaluation before implementation and will include, but aren't limited to changes to the Penske interface, database as it relates to Penske, removal of reports or other tools currently used by Penske employees or its carriers.

17. **Links to Other Sites.** The Epay site may include hyperlinks to websites maintained or controlled by others. Level One is not responsible for and does not endorse the contents of, use of, or any of the products or services offered in these sites.

18. **Cancellation.** You may cancel your Epay Membership at any time upon prior written notice to us, subject to terms and penalties set forth in this Agreement. Level One reserves the right to cancel this service at any time. If customer does not access account for a period of one (1) year, it will be terminated. Upon cancellation or termination of the Membership, Level One will delete your banking information in order to safeguard against illegal access to it.

19. **Hacking.** If your use, or attempt to use Epay for other purposes including but not limited to tampering, hacking, modifying or otherwise corrupting the security or functionality of Epay, your Membership will be terminated and you will be subject to damages and other penalties, including criminal prosecution where available.

20. **Assignability.** You may not transfer any rights or obligations you may have under these Terms and Conditions without the prior written consent of Level One. Level One reserves the right to transfer any right or obligation under this Service Agreement with written notice to Penske within 120 days of the transfer.

21. **Indemnification.** You agree to indemnify, defend and hold harmless Level One, its affiliates, officers, directors, and employees from any claim, action, demand, loss, or damages (including, but not limited to, attorneys' fees) made or incurred by any third party arising out of or relating to your use of Epay. Level One agrees to indemnify, defend and hold harmless Penske, its affiliates, officers, directors and employees from any claim, action, demand, loss, or damages (including, but not limited to, attorneys' fees) made or incurred by any third party arising out of or relating to Penske's use of Epay.

22. **Disclaimers.** The user of the Epay site and services assumes all responsibility and risk for the use of the servers and the Internet generally. Level One and its affiliates disclaim all warranties, representations, or endorsements, express or implied, with regard to the information accessed from, or via Level One's server or the Internet, including, but not limited to, all implied warranties of merchantability or fitness for a particular purpose. Level One will ensure the data received by Penske will populated into the correct data fields as specified in the technical documents agreed to by both parties. Level One does not assume any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed on the server or other material accessible from the servers. In no event shall Level One be liable for any special, indirect, or consequential damages, or any damages whatsoever resulting from loss of use, data, or profits, whether in an action of contract, negligence, or other tortious action, arising out of or in connection with the use or performance of the information on this server or the Internet generally.

23. **No Warranties.** To the extent that you utilize Epay, you acknowledge that there cannot be a guarantee that communications or transactions conducted online will be absolutely secure. You further acknowledge that there may be system failure that may limit your ability to use the online services. You agree to assume all risk and liability arising from your use of any Epay online services, including the risk of breach in the security of the communications or transactions you conduct with Level One. Level One's online services are provided "AS IS" without warranty of any kind, whether express or implied, including, without limitation, the implied warranties of merchantability, fitness for a particular purpose, or otherwise. Any Level One material on these servers may include technical inaccuracies or typographical errors. Level One is not responsible for any damages incurred, consequential or otherwise. Level One has the right to make changes and updates to any information contained within the servers with prior notice as described in Section 16 of this Agreement. The information provided on this server and site is provided on an "AS IS" and "AS AVAILABLE" basis without warranties of any kind, either express or implied, including, but not limited to, warranties of title, noninfringement or implied warranties of merchantability or fitness for a particular purpose. No advice or information given by Level One, its affiliates or their respective employees shall create any warranty. Neither Level One nor its affiliates warrant that the

_____ Initials                                                        _____ Initials

information on the servers or on the Internet generally will be uninterruptible or error free or that any information, software, or other material accessible from this server is free of viruses or other harmful components.

24. **Insurance.** Level One agrees to maintain a professional liability insurance policy in the amount of $1,000,000.00 during the term of this Agreement.

25. **Modifications.** This Agreement supercedes the Terms and Conditions posted on Epay and agreed to via registration.

26. **Controlling Law.** This Agreement is to be governed and construed in accordance with the laws of the State of Missouri, without regard to its conflict of law provisions.

27. **Entire Agreement.** This Agreement embodies the entire understanding among all of the parties with respect to its subject matter and supersedes all previous communications, representations or understanding, either oral or written.

28. **Severability.** In the event any provision of this Agreement is found to be invalid, voidable or unenforceable, the parties agree that unless it materially affects the entire intent and purpose of this Agreement, such invalidity, voidability, or unenforceability shall affect neither the validity of this Agreement nor the remaining provisions herein, and the provision in question shall be deemed to be replaced with a valid and enforceable provision most closely reflecting the intent and purpose of the original provision.

29. **Binding Agreement.** This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and its successors and permitted assigns.

30. **Media Releases.** All media releases, public announcements, and public disclosures by either party relating to this Agreement or the subject matter of this Agreement (each, a "Disclosure"), shall be subject to review and written approval by the other party prior to release, which shall not be unreasonably withheld.

31. **Inspection.** During the term of this Agreement, Penske or its representative may enter Level One's premises and hosting site during normal working hours to verify Level One's compliance with this Agreement. Penske must provide Level One with a minimum of 24 hour notice during normal business hours. Any inspection shall be undertaken in the presence of an authorized representative of Level One, and shall be limited to reasonable inquires to determine whether an infringement of this Agreement has occurred.

32. **Ethical Hack.** Penske, at its own expense, with coordination of Level One will be allowed to perform an ethical hack though its choice of providers. Any vulnerabilities detected that are determined severe, based on Penske's and GE's polices, must be remedied within 30 calendar days at no cost to Penske. Failure to resolve the issues within the 30 calendar days can be considered a breach of this Agreement.

33. **Software Versions.** Level One agrees to maintain stability, performance and security by keeping our operating systems within a minimum of two major releases, currently supported by the operating system vendor. When a new version of the operating system is released, Level One will evaluate the best time to upgrade, prior to the time that our existing operating system is no longer supported by the vendor.

_____ Initials                    _____ Initials

A signed Escrow Agreement for software, source code and data recovery will be executed between Level One Technologies, Inc. and Penske Truck Leasing Co., L.P. within 30 days of the execution of this Agreement.   If after 30 days from signing of this Service Agreement, a signed Escrow Agreement for software, source code and data recovery is not executed between Level One Technologies, Inc. and Penske Truck Leasing Co., L.P., this Service Agreement becomes null and void and no penalty under Section 14 of this Service Agreement will apply.

**Level One Technologies, Inc:**

Name:               Jason Kirkpatrick

Title:                Operations Manager

Signature:      (X)  _Jason K_____

Date:                 _4-7-08_____

**Penske Truck Leasing Co., L.P.:**

Name:           _ANDREAS AVTJOGLOU._

Title:           _SVPN CONTROLLER_

Signature:      (X)  _____

Date:                _Nov 7th 2008_____

_____ Initials   .                              _____ Initials

Case: 4:14-cv-01305-RWS   Doc. #: 1-1   Filed: 07/24/14   Page: 51 of 65 PageID #: 56

## SOFTWARE, SOURCE CODE AND DATA ESCROW AGREEMENT

THIS SOFTWARE, SOURCE CODE AND DATA ESCROW AGREEMENT (hereinafter "Agreement") entered into this _26th_ day of _January, 2009_, 2009, by and between Level One Technologies, Inc., a corporation existing under the laws of the State of Missouri (hereinafter "Level One") and Penske Truck Leasing Co., L.P., a limited partnership existing under the laws of the State of Delaware (hereinafter "Penske").

WHEREAS, Level One and Penske entered into a Services Agreement whereby Level One shall provide Penske access to certain data and information ("Services Agreement") to be found on the web site located at the URL http:" www.epaymanager.com ("Web Site"); and

WHEREAS, Penske seeks to secure rights, upon certain occurrences as addressed below, in the source code and data related to the Web Site and any software created by Level One needed to utilize and run the Web Site; and

WHEREAS, Penske also seeks to protect the confidential nature of any data submitted by Penske onto the Web Site; and

WHEREAS, Server Host and Escrow Agent is to be selected, contracted by and paid for by Level One and all fees will be reimbursed by Penske; and

WHEREAS, Level One and Penske desire to address the terms of their agreement as set forth below:

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other valuable consideration, the adequacy and receipt of which are hereby acknowledged, the parties hereby agree as follows:

1.     Definitions.

    (a)     The term "Web Site" shall mean Level One's web site found at the URL http:"www.epaymanager.com, updates, improvements, and enhancements thereof and from time to time developed by Level One and all documentation therefore developed by Level One.

    (b)     The term "Source Code" shall mean the source code listings and any other related developer/programmer-level documentation for the Web Site and any related software required to utilize and run the Web Site.

    (c)     The term "Data" shall mean any information or data submitted on the Web Site by Penske and Penske's payees and carriers.

    (d)     The term "Client Server" shall mean the server that is hosted with Level One's disaster recovery environment and that contains only Penske's data.  Access to the Client Server will be used for disaster and testing purposes and will contain the latest versions of the Web Site software, data and source code.

    (e)     The term "Level One Server" shall mean the server owned and operated by Level One which permits Penske to access and use the Web Site.

2.     Duties of Penske.

    (a)     In the event that the Web Site should cease to operate, for any reason whatsoever, except forced bankruptcy or insolvency or hostile takeover, Level One shall provide Penske with thirty (30) days notice prior to an expected shutdown.  Penske must notify Level One of its desire to take ownership of the Client Server, in accordance with the requirements of Paragraph 2(b), within ten (10) days after Level One's notification to Penske of Level One's expected shutdown.

    (b)     Penske agrees to reimburse Level One for the cost to host the Client Server, including, but not limited to, any software licenses required to run the Client Server. Level One will notify Penske in



writing within thirty (30) days of installing new software that requires the purchase of an license. In the event that Penske fails to reimburse Level One for the cost to host the Client Server, Level One can remove the Client Server with thirty (30) days written notice provided to Penske.

    (c)    In the event Level One undergoes a forced bankruptcy, insolvency, or hostile takeover in which Level One loses control of or access to the Web Site, Penske may have sole ownership of the Client Server, its software, source code and data.  The legal transfer of ownership must be requested in writing and will be controlled by an Escrow Agent. Any and all costs associated with retrieving Client Server, its software, source code and data from the Escrow Agent will be borne by Penske, and Level One shall be under no obligation to provide programmer(s), pay for, or arrange such a transfer of the Client Server, its software, source code, data or other information. Penske shall have no rights to sell, distribute, or use the Web Site, software, source code or data for any purpose other than Penske's own use as described in the Services Agreement.

3.    <u>Duties of Level One.</u>

    (a)    In the event that the Web Site should cease to operate for any reason whatsoever, except forced bankruptcy or insolvency or hostile takeover, Level One shall provide Penske with thirty (30) days notice prior to an expected shutdown.

    (b)    Level One will build, host, and maintain a Client Server for Penske as part of Level One's overall disaster recovery environment with a third party hosting service provider. The Client Server is specifically implemented for Penske and will require Penske's data and data entered by Penske's payees and carriers to be copied nightly. Level One will keep the Client Server current with the most recent versions of the Epay Manager Software and source code. The Client Server will not contain the installation of Level One's fax and imaging software unless Penske elects to purchase an additional usage license. The Client Server environment will be in place within ninety (90) days of the execution of this Agreement.

    (c)    Level One will provide to Escrow Agent any and all software, source code and data that would be required for Penske to continue its use of the software and/or Web Site as described in the Services Agreement in the event of any shutdown or cessation. The Escrow Agent will be in place and shall receive all required information and documentation within ninety (90) days of the execution of this Agreement.

    (d)    In the event Level One undergoes a forced bankruptcy, insolvency, or hostile takeover in which Level One loses control of or access to the Web Site, Level One hereby agrees that Escrow Agent shall transfer the ownership of the Client Server, its software, source code data and other programs and documentation necessary to run and maintain the Client Server to Penske. Any and all costs associated with retrieving Client Server, its software, source code and data from the Escrow Agent will be borne by Penske, and Level One shall be under no obligation to provide programmer(s), pay for, or arrange such a transfer of the Client Server, its software, source code, data or other information. Penske shall have no rights to sell, distribute, or use the Web Site, software, source code or data for any purpose other than Penske's own use as described in the Services Agreement.

    (e)    The Client Server, its software, source code and data will be available for release to Penske, so long as Penske remains a member in good standing of Epay Manager and is entitled to receive support. Release of the hosted Client Server, its software, source code and data is dependent upon (i) written authorization of such release by both by Level One and Penske or (ii) the receipt by Escrow Agent of a valid court order or arbitration order or (iii) Penske providing notice to the Escrow Agent that a default has occurred under this Agreement and that such default has not been cured by Level One per the terms of the Agreement.

    (f)    In the event Escrow Agent ceases to operate or terminates its relationship with Level One, Level One will make all commercially reasonable efforts to promptly enter into an agreement with an alternative Escrow Agent of similar nature. Level One shall provide Penske with immediate

Case: 4:14-cv-01305-RWS   Doc. #: 1-1   Filed: 07/24/14   Page: 53 of 65 PageID #: 58

written notice of such occurrence, and Level One agrees that the contract between Level One and the Escrow Agent shall require that Escrow Agent also provide prior written notice to Penske with not less than thirty (30) days prior notice if Escrow Agent terminates its relationship with Level One.

4.    Duties of Escrow Agent.

    (a)    The Escrow Agent shall issue to Level One and to Penske a receipt for any and all materials upon delivery of each item. Any and all materials held by the Escrow Agent shall remain the exclusive property of Level One, and the Escrow Agent shall not use the materials or disclose the same to any third party except as specifically provided for herein.  The Escrow Agent shall hold the materials in safekeeping at its offices herein indicated unless and until the Escrow Agent receives notice pursuant to the terms of this Agreement that the Escrow Agent is to deliver the materials, or any part thereof, to Penske or Level One, in which case the Escrow Agent shall deliver the materials, or any part thereof, to the party identified in the notice, subject, however, to the provisions of this Agreement.  The Escrow Agent shall monitor access to the server in the event that Level One ceases to operate.

5.    Representation of Level One to Penske.

    (a)    Source Code.  Level One represents and warrants to Penske that the software and source code to be transferred to the Client Server or Escrow Agent hereunder shall include all revisions, corrections, enhancements, or other changes, and shall be in a form suitable for reproduction and use by computer equipment and in condition necessary to allow a reasonably skilled third-party programmer, analyst, or operator to maintain or enhance the system licensed without the help of any other person or reference to any other material.

    (b)    Data.  Level One makes no representations or warranties with respect to the accuracy of the Data. Such shall be the sole responsibility of Penske.  Any inputs, entries, revisions, updates, or corrections shall be the sole responsibility of Penske.  Level One does represent and warrant that any Data entered by Penske shall be stored and maintained for access and use by Penske for a period of at least one year after the Data is first entered onto the Web Site.

6.    Notice of Default; Effect of Default.

    (a)    Level One shall be deemed to be in default of its responsibilities to Penske if:

        (i)    Level One is unable or unwilling to discharge any of its maintenance obligations with respect to the Web Site in accordance with the warranties or other standards for such maintenance set forth in the Services Agreement or in any other software agreement from time to time in effect between Level One and Penske, within ten (10) days after Penske's notification specifying in reasonable detail in what respects the Web Site is not properly being maintained; or

        (ii)    Level One becomes insolvent, makes a general assignment for the benefit of creditors, files a voluntary petition of bankruptcy, suffers or permits the appointment of a receiver for its business or assets, becomes subject to any proceeding under any bankruptcy or insolvency law, whether domestic or foreign, or has dissolved, liquidated, or ceased its business voluntarily or otherwise, and Penske has compelling reasons to believe that such event(s) will cause Level One to fail to meet its warranty and maintenance obligations in the foreseeable future.

    (b)    Upon the occurrence of any event in Paragraph 6(a)(i) or 6(a)(ii), Penske shall give written notice (hereinafter "Notice of Default") to Escrow Agent and Level One of any default by Level One. The Notice of Default shall, at a minimum, (a) be labeled "Notice of Default," (b) identify the

Services Agreement and this Agreement, (c) specify the nature of the default, (d) identify the Source Code, and (e) demand access to the Client Server.

(c)    If Level One desires to dispute the Notice of Default, Level One shall, within ten (10) days after the receipt of the copy of the Notice of Default, deliver to Escrow Agent a sworn statement (hereinafter "Affidavit") stating that no default has occurred, whereupon the provisions of Paragraph 8 hereof will become applicable. If Escrow Agent receives the Affidavit within said ten (10) days, Escrow Agent shall send a copy thereof to Penske by certified or registered mail, return receipt requested, and Escrow Agent shall continue to hold any materials in its possession in accordance with this Agreement. If Escrow Agent does not receive the Affidavit within said ten (10) days, Escrow Agent is authorized and directed to deliver the materials described in the Notice of Default to Penske.

(d)    If, upon receipt of the Notice of Default, Level One does not dispute the Notice of Default as described above, then Level One shall transfer sole ownership of the Client Server, its software, source code and data to Penske. Penske will be given ownership and title to the Client Server and all Data, software, and source code found on Client Server.  Further, Penske shall also be transferred the right to maintain, change, and customize the Client Server as it deems necessary in its sole discretion. Data located and stored on the Level One Server shall remain the property of Level One. Penske is prohibited from selling, distributing, or using the Source Code or program for any purpose other than Penske's own use as described in the Services Agreement.

7.      Notice of Termination. Upon the termination of the Services Agreement by Level One resulting from an uncured breach by Penske, Level One may demand and obtain the return of any and all Level One materials in Penske's possession by furnishing written notice of the termination, agreed to by the authorized and notarized signature of Penske's representatives. Upon the termination of the Services Agreement by Level One resulting from an uncured breach by Penske, Penske shall have no right or interest in the Level One Server or the Client Server.

8.      Disputes.

(a)    In the event that Level One files the Affidavit with Escrow Agent in the manner and within the time period set forth in Paragraph 6(c) hereof, or if Penske shall fail to agree that the Services Agreement has been terminated, Escrow Agent shall not release any materials in its possession to either party except in accordance with (i) a final decision of the arbitration panel as hereinafter provided, or (ii) receipt of an agreement with authorized and notarized signatures of both Level One and Penske, authorizing the release of the materials to one of the parties hereto.

(b)    Any controversy or claim arising out of or relating to this Agreement or the breach thereof, except as stated below, shall be settled by arbitration in St. Louis, Missouri, in accordance with the rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The prevailing party in such arbitration shall be entitled to recover from the other party the amount of all attorneys' fees, expenses, and costs incurred by such prevailing party obtaining such judgment, or in the event the arbitrator renders a partial decision against each party, then each party shall pay their pro-rata portion of the attorneys' fees, expenses, and costs incurred by both parties. Escrow Agent shall give prompt effect to any authenticated arbitration award, notwithstanding the right of either party to seek, in any court having jurisdiction thereof, enforcement or a stay of any award rendered by the arbitrator(s).

9.      Payment to Escrow Agent. Payment for escrow setup and services to the Escrow Agent shall be paid by Level One and reimbursed by Penske. Penske, at its option, may pay any fees owed to Escrow Agent upon Level One's failure to make such payments. Any payments made by Penske to Escrow Agent shall be reimbursed, in full, by Level One. All costs related to the Escrow Agent will be authorized by Level One and Penske before contracting with the Escrow Agent.

10.   Payment for Client Server.  All fees related to the setup, use and maintenance of the Client Server shall be paid by Level One and reimbursed by Penske.  All costs related to the Client Server will be authorized by Level One and Penske before contracting with the host of the Client Server.

11.   Termination.  This Escrow Agreement shall terminate upon the delivery of all materials to either party in accordance with the terms of this Agreement.

12.   Limitation on Escrow Agent's Responsibility and Liability

(a)    Escrow Agent shall not be obligated or required to examine or inspect the Source Code, the Source Code documentation, or any of the revisions thereof.  Escrow Agent's obligation for safekeeping shall be limited to providing the same degree of care for the materials as it maintains for its valuable documents and those of its customers lodged in the same location with appropriate atmospheric or other safeguards.  However, the parties agree and acknowledge that Escrow Agent shall not be responsible for any loss or damage to any of the Source Code due to changes in such atmospheric conditions (including, but not limited to, failure of the air-conditioning system), unless such changes are proximately caused by the gross negligence or malfeasance of Escrow Agent.

(b)    Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, receipt, or other paper or document furnished to it, not only in assuming its due execution and the validity and effectiveness of its provision, but also as to the truth and acceptability of any information therein contained, which it in good faith believes to be genuine and what it purports to be.

(c)    In no event shall Escrow Agent be liable for any act or failure to act under the provisions of this Agreement except where its acts are the result of its gross negligence or malfeasance.  Escrow Agent shall have no duties except those which are expressly set forth herein, and it shall not be bound by any notice of a claim, or demand with respect thereto, or any waiver, modification, amendment, termination, or rescission of this Agreement, unless in writing received by it, and if its duties herein are affected, unless it shall have given its prior written consent thereto.

(d)    The parties to this Agreement hereby jointly and severally agree to indemnify Escrow Agent against any loss, liability, or damage (other than any caused by the gross negligence or malfeasance of Escrow Agent), including reasonable costs of litigation and counsel fees, arising from and in connection with the performance of its duties under this Agreement.

13.   Notice.  Any notice required by this Agreement shall be sufficient if it is in writing and if hand-delivered or sent by registered mail to:

(a)    If to Penske:

Penske Truck Leasing Co., L.P.
Route 10 Green Hills
Reading, PA 19603
ATTN: VP-Logistics Support Services

(b)    If to Level One:

Level One Technologies, Inc.
875 Fee Fee Road
St. Louis, MO 63043
ATTN: Thomas B. Whaley

14.   Applicable Law.  This Agreement shall be governed by the laws of the State of Missouri.

15. <u>Severability</u>.  If any clause herein shall be construed to be invalid or unenforceable by any court or governmental body or agency having jurisdiction thereof, then this Agreement shall be interpreted as though that clause has been omitted, and the validity of the remaining clauses of this Agreement shall not be affected thereby.

16. <u>Waiver</u>.  No waiver of any breach of this Agreement shall constitute a waiver of a subsequent breach, whether or not of the same nature.

17. <u>Assignment</u>.  Neither party shall assign or subcontract all or any part of this Agreement, or any interest therein, without the prior written consent of all other parties, except that Penske may assign to any subsidiary or other corporate affiliate without the consent of Level One and/or Escrow Agent, and Level One may assign to any subsidiary or other corporate affiliate without the consent of Penske and/or Escrow Agent.

18. <u>Entire Agreement and Modification</u>.  This Agreement expresses the entire Agreement between the parties with respect to subjects covered by this Agreement. This Agreement shall remain in full force and effect until its expiration or termination. No change or modification of this Agreement's terms shall be valid or binding, except as may be provided in other paragraphs, unless the change or modification shall be in writing and signed by all parties.

19. <u>Binding Agreement</u>.  This Agreement shall be binding upon and inure to the benefit of each of the parties hereto and its successors and permitted assigns.

20. <u>Authorization</u>.  Each party hereto expressly acknowledges that it is authorized to enter into this Agreement and to bind such party to the terms and provisions hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.

Level One Technologies, Inc.

By: _____
Thomas B. Whaley, President

"Level One"

Penske Truck Leasing Co., L.P.
By: Penske Truck Leasing Corporation
     General Partner

By: _____
Title: Thomas D. McKenna, SVP, Engineering & Technology

"Penske"

# FIRST AMENDMENT
## TO
## SERVICES AGREEMENT
### AND
## SOFTWARE, SOURCE CODE AND DATA ESCROW AGREEMENT

THIS FIRST AMENDMENT (hereinafter "First Amendment") is entered into by and between Level One Technologies, Inc., a Missouri corporation (hereinafter "Level One") and Penske Truck Leasing Co., L.P., a Delaware limited partnership (hereinafter "Penske").

WHEREAS, Level One and Penske entered into a Services Agreement executed as of November 7, 2008, for services obtained by Penske from Level One, including access to the web site located at URL http://www.epaymanager.com (hereinafter "Web Site") and for other services described therein (hereinafter "Services Agreement"); and

WHEREAS, Level One and Penske entered into a Software, Source Code and Data Escrow Agreement executed on January 26, 2009, for Penske to secure rights, under specified circumstances, in the Source Code and Data related to the Web Site and any software created by Level One needed to utilize and run the Web Site (hereinafter "Source Code and Data Agreement"); and

WHEREAS, Level One and Penske entered into a Letter Agreement dated February 27, 2009, confirming the parties' intention to modify certain terms of the Services Agreement and the Source Code and Data Agreement (hereinafter "Letter Agreement");

WHEREAS, the Letter Agreement set forth a mutual obligation of the parties to work together in good faith to execute an amendment consistent with the terms of the Letter Agreement; and

WHEREAS, the parties intend for this First Amendment to satisfy the mutual obligations of the parties to formally amend the Services Agreement and the Source Code and Data Agreement as set forth in this First Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and for other valuable consideration, the adequacy and receipt of which the parties hereby acknowledge, the parties agree as follows:

1.      Capitalized terms used in this First Amendment and not otherwise defined herein shall have the meanings ascribed to them in the Services Agreement and in the Source Code and Data Agreement.

2.      The Services Agreement is hereby amended as follows:

      a.      Section 7 – Fees is revised by inserting the following:

            "Once Penske confirms the successful transition of the Penske Instance to a server in the Penske data center, Level One will be paid an additional $250,000 as an advance against future transaction fees per the Services Agreement. Should the Services Agreement terminate, and the advance not be fully used, the difference between the amount advanced and the amount due for transaction fees during the

1

EXHIBIT

C

term that the Services Agreement was in effect, will be immediately returned to Penske. Credits for actual transaction fees against the advance will be calculated by Level One on a weekly basis. Credits issued in repayment of the advance will also include charges for document imaging as defined in the Services Agreement. If, at no fault of Level One, Penske cannot complete the transition by April 30, 2009, and provided that Level One has fulfilled its responsibility to complete a QA/DR server with a third party, the full balance of the advance will be paid to Level One, unless such delay resulted from an event of force majeure in which event Penske shall have additional time equal to the length of the force majeure delay to complete the transition.

Penske agrees that if Level One has fulfilled its QA/DR requirements, and Penske has not paid the remaining balance of the advance of $250,000 due to delays attributable to Penske, and Penske's delay causes Level One to cease operations, then Penske has no right or license to use the Epay software or Source Code."

     b.    Section 18 is revised by deleting the second sentence in its entirety and inserting the following in lieu thereof:

"Level One reserves the right to cancel this service in the event of a material default by Penske that is not cured within thirty (30) days after written notice of such default from Level One. In the event of such termination, Level One shall immediately refund to Penske the difference between the amount advanced to Level One by Penske and the amount due for transaction fees during the term that the Services Agreement was in effect."

     c.    Section 22 is revised by deleting the last sentence in its entirety and inserting the following in lieu thereof:

"In no event shall Level One or Penske be liable for any special, indirect, or consequential damages, or any damages whatsoever resulting from loss of use, data, or profits, whether in an action of contract, negligence, or other tortuous action, arising out of or in connection with the use or performance of the information on the server or the Internet generally."

     d.    Section 23 is revised by deleting the seventh sentence in its entirety and inserting the following in lieu thereof:

"Level One has the right to make changes and updates to any information contained within Level One's servers with prior written notice as described in Section 16 of this Agreement."

     e.    The final paragraph immediately preceding the signatures is revised by replacing the phrase "30 days" in the second line and in the third line with the phrase "90 days" in each instance.

2

3.      The Source Code and Data Agreement is hereby amended as follows:

      a.      The title and the first line are revised by replacing "Software, Source Code and Data Escrow Agreement" with "Software, Source Code and Data Agreement".

      b.      The fourth WHEREAS paragraph is deleted in its entirety.

      c.      Section 1(d) is revised by deleting this Section in its entirety and inserting the following in lieu thereof:

            "The term "Client Server" shall mean the server that is hosted at Penske's data center that contains only Penske's Data and will be kept within one level and release of Level One's primary implementation."

      d.      Section 2(b) is revised by deleting this subparagraph in its entirety, and inserting the following in lieu thereof:

            "Penske will be responsible for purchasing and installing all hardware and operating systems required to host the Client Server at Penske's data center."

      e.      Section 2(c) is revised by deleting the second and third sentences in their entirety.

      f.      Section 2 is further revised by inserting the following new subparagraphs 2(d), 2(e), and 2(f):

            "(d) Penske will pay Level One a one-time fee of Fifty Thousand Dollars ($50,000) for: a testing and disaster recovery ("QA/DR") license; Level One's assistance in setting up the Client Server at Penske's data center; maintaining and supporting the software; and quarterly testing of the Client Server. Payment of the one-time fee will be made in weekly installments of Ten Thousand Dollars ($10,000) for five (5) consecutive weeks commencing on March 2, 2009.

            (e) Penske shall protect the Source Code from unauthorized access or distribution, and Penske shall not copy, alter, or use the Source Code in any fashion, unless Level One ceases operations or support, or for any of the other reasons set forth in this Agreement. Should Level One cease operations or support, or if any of the other events set forth in this Agreement should occur, Penske will then be permitted to use the Source Code in any fashion necessary for Penske to support the ePay Manager application, except that Penske shall have no rights to sell, distribute or use the Web Site, software, Source Code or Data

3

for any purpose other than for Penske's own use as described in the Services Agreement.

(f) Penske agrees that it will not use, copy, or transfer any gained knowledge from the Epay application data and Source Code for the purpose of developing an identical or similar version of ePay for Penske's proprietary use as long as Level One is both operational and is processing transactions under its continuing Services Agreement with Penske. However, nothing in this Agreement, or in the Services Agreement, shall prohibit Penske, using publicly available information regarding the ePay system or Penske's own knowledge and experience of how freight payment is done in the industry, from developing an application that provides similar functionality."

g.      Section 3(b) is revised by deleting the phrase "with a third party hosting service provider" in the second line, and replacing it with the phrase "at Penske's data center".

h.      Section 3(c) is revised by replacing the phrase "Escrow Agent" with "Penske" in the first line, and by deleting the last sentence in its entirety.

i.      Section 3(d) is revised by deleting the phrase "hereby agrees that Escrow Agent" in the first sentence of this subparagraph, and by deleting the phrase "from the Escrow Agent" in the second sentence of this subparagraph.

j.      Section 3(e) is revised by deleting the phrase "or (ii) the receipt by Escrow Agent of a valid court order or an arbitration order" beginning in the fourth line and by replacing the phrase "the Escrow Agent" with "Level One" beginning in the fifth line.

k.      Section 3(f) is deleted in its entirety and replaced with the following:

"Level One will help Penske to assemble and implement any open source software required. Level One represents to Penske that no third party software licenses are required, except for a license to receive and process electronic documentation (i.e. proof of delivery documents) which Penske has declined to make a part of the Client Server."

l.      Section 3 is further revised by inserting the following new subparagraphs 3(g), 3(h), 3(i), and 3(j):

"3(g) Level One will conduct quarterly testing of the Client Server, share the test results with Penske, and perform any remediation required at no additional cost to Penske.

3(h) Level One will continue maintenance, support, and ongoing testing of the Client Server as long as the Services Agreement

4

exists. The Client Server will be kept within one level and release of Level One's primary ePay implementation.

3(i) Level One will provide to Penske a read only copy of the Source Code to whatever ePay software is installed on the Client Service. In addition, Level One will provide an update weekly of any Source Code being developed for Penske, even if not yet put into production.

3(j) Level One grants to Penske a QA/DR license to use the ePay system, to test the ePay system on the Client Server, and to use the ePay system in the event Level One is unable to process transactions for a substantial period of time on the Level One Server. This conditional license shall remain in effect as long as Penske is using the Level One services. In the event that Level One ceases operations or is unable to provide the services described in the Services Agreement, Level One agrees that the above mentioned conditional license will automatically convert to a full, perpetual license for Penske to immediately begin to use the ePay system in production without further obligation to Level One or Level One's successors. As stated in this Agreement, if Level One ceases operations or is unable to provide services, Penske shall have no rights to sell, distribute, or use the Web Site, software, Source Code or Data for any purpose other than Penske's own use as described in the Services Agreement."

m.      Section 4 is deleted in its entirety.

n.      Section 5(a) is revised by deleting the phrase "or Escrow Agent" in the second line.

o.      Section 6(b) is revised by deleting the phrase "or Escrow Agent" in the second line, by inserting the word "and" before item (c), and by deleting the following phrase: "(d) identify the Source Code, and (e) demand access to the Client Server".

p.      Section 6(c) is revised by deleting this subparagraph in its entirety and inserting the following in lieu thereof:

"If Level One desires to dispute the Notice of Default, Level One shall, within ten (10) days after the receipt of the copy of the Notice of Default, deliver to Penske a sworn statement (hereinafter "Affidavit") stating that no default has occurred."

q.      Section 6(d) is revised by deleting the fourth sentence in its entirety.

r.      Section 8(a) is deleted in its entirety.

s.      Section 8(b) is revised by deleting the last sentence in its entirety.

5

  t.  Section 9 is deleted in its entirety.

  u.  Section 10 is revised by deleting this section in its entirety and inserting the following in lieu thereof:

> "Penske shall pay fees to Level One for the Client Server at Penske's data center as described in Section 2(d) of the Source Code and Data Agreement."

  v.  Section 12 is deleted in its entirety.

  w.  Section 17 is revised by deleting the phrase "and/or Escrow Agent" in each instance in the third line and beginning in the fourth line.

  3.  All provisions of the Services Agreement and the Source Code and Data Agreement not amended by this First Amendment shall remain in full force and effect. The Services Agreement and the Source Code and Data Agreement, as amended by this First Amendment, are hereby ratified and confirmed.

  This First Amendment has been executed by duly authorized representatives of Level One and Penske on the dates stated below.

LEVEL ONE TECHNOLOGIES, INC.    PENSKE TRUCK LEASING CO., L.P.
                 By:  Penske Truck Leasing Corporation,
                    General Partner

By: Thomas Whaley      By: _____

Name: THOMAS WHALEY    Name: William L. Stobbart

Title: PRESIDENT       Title: SVP, IT

Date: 3-27-09        Date: 3/31/2009



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>GLORIA CLARK RENO | Case Number:  14SL-CC02101 |
|---|---|
| Plaintiff/Petitioner:<br> LEVEL ONE TECHNOLOGIES INC<br><br><br><br>vs. | Plaintiff's/Petitioner's Attorney/Address<br>CHARLES S KRAMER<br>7700 BONHOMME AVE<br>BONHOMME PLC 7TH FL<br>SAINT LOUIS, MO  63105 |
| Defendant/Respondent:<br> PENSKE TRUCK LEASING CO LP | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>7900 CARONDELET AVE |
| Nature of Suit:<br>CC Breach of Contract | CLAYTON, MO  63105                   (Date File Stamp) |

## Summons in Civil Case

| | |
|---|---|
| **The State of Missouri to:**  PENSKE LOGISTICS LLC | |

**Alias:**

221 BOLIVAR STREET       **SERVE CORPORATION SERVICE**
JEFFERSON CITY, MO  65101  **COMPANY**

*COURT SEAL OF*



*ST. LOUIS COUNTY*

        You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for Plaintiff/Petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service.  If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.
        **SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739 or TTY at 314-615-4567, at least three business days in advance of the court proceeding.**

<u>07-JUL-2014</u>
**Date**                                        _/s/ Joan M. Gilmer_
                                               **Clerk**
**Further Information:**
**TLC**

### Sheriff's or Server's Return

**Note to serving officer:**  Summons should be returned to the court within thirty days after the date of issue.

I certify that I have served the above summons by:  (check one)

☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.

☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____ a person of the Defendant's/Respondent's family over the age of 15 years.

☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to

_____ (name) _____ (title).

☐ other _____

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date) at _____ (time).

_____       _____
Printed Name of Sheriff or Server       Signature of Sheriff or Server

       **Must be sworn before a notary public if not served by an authorized officer:**

       Subscribed and sworn to before me on _____ (date).

*(Seal)*       My commission expires: _____   _____
                              Date                     Notary Public

| **Sheriff's Fees, if applicable** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Sheriff's Deputy Salary<br>Supplemental Surcharge | $____10.00____ |
| Mileage | $_____ (_____ miles @ $._____ per mile) |
| **Total** | $_____ |

A copy of the summons and a copy of the petition must be served on **each** Defendant/Respondent.  For methods of service on all classes of suits, see Supreme Court Rule 54.

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

LEVEL ONE TECHNOLOGIES, INC.,    )
    )
        Plaintiff,    )   Case No.:   14SL-CC02101
v.    )   Division No.  19
    )
PENSKE TRUCK LEASING CO., L.P.,    )
et al.,    )
        Defendants    )

## ACCEPTANCE OF SERVICE

I, Douglas Y. Christian, hereby certify that I and Ballard Spahr, LLP have been authorized by

Penske Truck Leasing Co., L.P. and Penske Logistics, L.L.C. to accept service of the Summons and

Petition filed in above-styled action on each of such Defendants' behalves, and that the Summons and

Petition directed to each of the Defendants was received by us, and is considered served upon them, on

this 10th day of July, 2014.   Defendants shall file their initial response to the Petition on or before August

30, 2014.

BALLARD SPAHR, LLP
By:
Douglas Y. Christian
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103-7599
(215) 665-8500
(215) 864-8999 (fax)
christiand@ballardspahr.com

-Plaintiffs agree that the response of each Defendant to the Petition filed herein shall be due on August 29,
2014.

RIEZMAN BERGER, P.C.

By:
Charles S. Kramer #34416 (Lead Counsel)
Joseph D. Schneider #57484
7700 Bonhomme, 7th Floor
St. Louis, Missouri 63105
(314) 727-0101
(314) 727-6458 (fax)
kramer@riezmanberger.com
schneider@riezmanberger.com

{00377763- 1 26359-005}           1

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

RECEIVED & FILED
CIRCUIT COURT OF
ST. LOUIS COUNTY

2014 JUL 14 P 4: 25

JOAN M. GILMER
CIRCUIT CLERK

LEVEL ONE TECHNOLOGIES, INC.,            )
                                         )
                     Plaintiff,          )      Case No.:      14SL-CC02101
v.                                       )      Division No.   19
                                         )
PENSKE TRUCK LEASING CO., L.P.,          )
et al.,                                  )
                     Defendants          )

## RETURN OF SERVICE

COMES NOW Plaintiff Level One Technologies, Inc., and files herewith the Acceptance of

Service executed on behalf of the Defendants herein.

RIEZMAN BERGER, P.C.

By:_____
Charles S. Kramer #34416 (Lead Counsel)
Joseph D. Schneider #57484
7700 Bonhomme, 7th Floor
St. Louis, Missouri 63105
(314) 727-0101
(314) 727-6458 (fax)
kramer@riezmanberger.com
schneider@riezmanberger.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing instrument was mailed via first class mail on this _____
day of July, 2014, addressed to:

Mr. Douglas Y. Christian
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599

_____

{00377958- 1 26359-005}