UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| LEVEL ONE TECHNOLOGIES, INC., | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:14 CV 1305 RWS |
| PENSKE TRUCK LEASING CO., L.P., and PENSKE LOGISTICS LLC, | ) ) ) ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff Level One Technologies, Inc. ("Level One") claims that Defendants Penske Truck Leasing Co., L.P. and Penske Logistics LLC (collectively referred to herein as "Penske") failed to fulfill certain promises and duties concerning its use of Level One's transportation payment services. Penske submitted a motion for partial summary judgment on five of six of Level One's contractual and equitable claims. Based upon a review of the record before me, I will grant in part and deny in part Penske's motion for partial summary judgment. I will grant summary judgment as a matter of law and dismiss Level One's volume-based contract, fraud, negligent misrepresentation, and good faith and fair dealing claims under Counts II, III, and IV and Subparagraphs 101(a), 101(b), 101(c), and 101(g) of Count I of Level One's Second Amended Complaint (the "SAC"). However, I will

deny summary judgment as to Level One's unjust enrichment claim under Count VI of the SAC.

I. *Background*

The following facts in this matter are undisputed. Penske provides services including transportation leasing, shipping services, and supply chain management. Level One develops and markets software products. Level One developed Epay Manager ("Epay"), a web-based electronic payment system that allows transportation companies to send invoices and pay bills electronically. In early 2008, Level One and Penske representatives began discussing the possibility of arranging for Penske using Epay to manage and process shipping transaction payments for its customers. The parties met and exchanged various communications concerning the terms of their potential business engagement.

On November 7, 2008, Level One and Penske Truck Leasing Co., L.P. entered into a written Services Agreement (the "Services Agreement"), which includes the following relevant terms. Under paragraph 1, the parties agree to an initial term of sixty (60) months, unless earlier terminated by the parties, with automatic renewal every two years. Under paragraph 5, Penske agrees to receive electronic communications regarding Epay. Under paragraph 7, the parties agree that Penske will pay Level One a nonrefundable fee of $1.55 per transaction, or

$1.90 for each transaction processed through the ACH network.  Under paragraph 14, Penske agrees to pay Level One a "termination penalty" of $150,000 if Penske terminates the agreement prior to the processing of 100,000 transactions or two years of processing time from the date of the agreement, whichever comes first.  Under paragraph 18, Penske may cancel its Epay membership at any time upon prior written notice to Level One, and Level One may cancel the service at any time.  Under paragraph 27, the parties agree that the Services Agreement "embodies the entire understanding among all of the parties with respect to its subject matter and supersedes all previous communications, representations or understanding, either oral or written."

Following the execution of the Services Agreement, Penske began using Epay to process transactions.  In December 2008, Level One and Penske representatives exchanged a series of communications concerning the scope of the engagement.  Jason Kirkpatrick of Level One requested that Penske provide volume and scheduling projections for customers being moved to Epay, stating "[o]bviously we won't hold you to any of these schedules.  Estimates are fine."  Penske provided the requested estimates in a spreadsheet showing annual transaction volumes for each customer to be moved to Epay.  The total estimated number of items was 913,846.  Raymond Gaspari of Penske emailed, "[w]e need to

3

drill down on these more, so don't hold me to this yet, but for a first cut it should work. As you know with all the variables in the marketplace right now, things could change rather quickly." In February 2009, Level One's President, Thomas Whaley, sent an email complaining of Penske's average volume of 264 transactions per week. Penske representative Andrew Avtjoglou responded that "[t]he volumes were never going to be guaranteed because we did not have experience in the marketplace." The parties amended the Services Agreement by a First Amendment dated March 31, 2009. The First Amendment, *inter alia*, provides for Penske to pay Level One a $250,000 advance against future transaction fees, which is partially returnable to Penske if the agreement terminates before the advance is fully used. The parties further amended the Services Agreement by a Second Amendment dated November 17, 2009. The parties continued to communicate about the transition of Penske customers to Epay and estimated volumes. Penske processed thousands of transactions through Epay over the next few years. However, the transaction volumes that Level One had anticipated failed to materialize. Moreover, Penske developed its own electronic payment system, known as "POPS."

Level One brought this suit against Penske in June 2014. Penske moved for partial summary judgment as a matter of law on five of six of Level One's

contractual and equitable claims – Counts I, II, III, IV, and VI of the SAC.[1] Each claim is discussed in more depth below.

II. *Legal Standard*

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>Lynn v. Deaconess Medical Center</u>, 160 F.3d 484, 486 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). The party seeking summary judgment bears the initial responsibility of informing the court of the basis of its motion and identifying those portions of the affidavits, pleadings, depositions, answers to interrogatories, and admissions on file which it believes demonstrates the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. <u>Id.</u> at 324. In

---

[1] <u>See</u> Doc. [99]. Penske has not asked for summary judgment on Level One's Count V: Misappropriation of Trade Secrets claim, which alleges that Penske used information and knowledge from the Epay Manager electronic payment system to develop its replacement "POPS" electronic payment system. With respect to Count I: Breach of Contracts, Penske only asks for summary judgment for alleged breaches of obligations concerning promised volumes, not with respect to the portion of this claim concerning POPS development.

resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

    III.   *Discussion*

Penske moved for summary judgment as a matter of law on Level One's claims for breach of contract, fraud, negligent misrepresentation, breach of the duty of good faith and fair dealing, and unjust enrichment. After a review of the record before me and based upon the reasons that follow, I find that Level One's volume-based contract, fraud, negligent misrepresentation, and good faith and fair dealing claims fail as a matter of law. However, viewing the facts in the light most favorable to the nonmoving party, Level One's unjust enrichment claim survives. As a result, I will grant in part and deny in part Penske's motion for summary judgment.

    a.  *Count I: Breach of Contract – Volume Claims*

Level One asserts that Penske is contractually liable for: (i) failing to use Epay for all transactions and all customers; (ii) failing to use Epay for a minimum of 913,846 transactions annually for certain identified customers; (iii) failing to timely transition its customers to Epay; (iv) failing to pay Level One amounts due under the Services Agreement; and (v) inappropriately directing its carriers to stop

6

using Epay (collectively referred to herein as the "Volume Claims").[2] The Volume Claims primarily rely upon Level One's assertion that Penske made, and breached, enforceable promises to process a higher volume of transactions using Epay than it actually processed. Penske moves for summary judgment as to the Volume Claims.[3] For the reasons that follow, I will grant summary judgment in Penske's favor as a matter of law with respect to the Volume Claims.

To state a cause of action for breach of contract under Missouri law, a plaintiff must allege "(a) the making and existence of a valid and enforceable contract between the plaintiff and defendant, (b) the right of the plaintiff and obligation of the defendant thereunder, (c) a violation thereof by defendant, and (d) damages resulting to the plaintiff from the breach." Union Elec. Co. v. Consolidation Coal Co., 188 F.3d 998, 1001 (8th Cir. 1999) (quoting Gilomen v. Southwest Mo. Truck Center, 737 S.W.2d 499, 500–01 (Mo.Ct.App.1987)). Both parties acknowledge that the Services Agreement is valid, but they disagree as to the scope of their agreement and intention. With respect to the Volume Claims,

---

[2] Level One presents each of these claims under subparagraphs 101(a), 101(b), 101(c), and 101(g) of Count I of the SAC. Level One states in its response to the summary judgment motion that items (i) and (ii) represent two separate breaches of contract, while items (iii), (iv), and (v) are "factual examples of how Penske breached obligations to use Epay for all transactions." I will discuss and rule on them together to the extent that they involve the same issues.

[3] Penske has not moved for summary judgment with respect to the remaining portion of Level One's breach of contract claim, concerning POPS development.

Level One asserts that the Services Agreement is either silent or ambiguous as to the parties' agreed-to transaction volumes. Additionally, Level One suggests that the parties may have entered into at least one additional enforceable contract concerning transaction volumes. Penske asserts that the Services Agreement controls, and fails to support the Volume Claims because the agreement does not require Penske to use Epay for a certain number of transactions.

Level One does not suggest that Penske breached any specific term of the Services Agreement with respect to the Volume Claims. Instead, Level One argues that Penske made additional promises beyond those expressly memorialized in the Services Agreement. As a result, Level One requests that I consider extrinsic evidence in support of the Volume Claims. Level One cannot submit extrinsic evidence regarding the Volume Claims if the Services Agreement is unambiguous and integrated. See, e.g., Royal Banks v. Fridkin, 819 S.W.2d 359, 361 (Mo.1991) (en banc) ("The parol evidence rule bars extrinsic evidence, unless an integrated contract is ambiguous."); Clearly Canadian Beverage Corp. v. American Winery, Inc., 257 F.3d 880, 889 (8th Cir. 2001) (applying Missouri law) ("The law conclusively presumes all prior and contemporaneous agreements have been merged into an unambiguous written contract, which becomes the final memorial of the agreement."). Integration clauses are generally "intended to

8

prevent extrinsic evidence of other agreements from influencing the interpretation of a final written contract, preserving the sanctity of written contracts." Johnson ex rel. Johnson v. JF Enterprises, LLC, 400 S.W.3d 763, 768–69 (Mo. 2013) (en banc) (citation omitted).

Penske asserts that the Services Agreement, which controls, precludes the admission of parol evidence. Specifically, Penske references the penalty clause under Paragraph 14 of the Services Agreement and the integration clause under Paragraph 27 of the Services Agreement. Level One argues that these clauses are unenforceable, and in any event are limited to items addressed by the agreement. Rather than presenting any specific ambiguity in the Services Agreement, Level One instead suggests generally that the fee, penalty, and integration clauses might be ambiguous. In the alternative, Level One asserts that parol evidence is admissible because the Services Agreement is silent as to the subject matter of the Volume Claims. Level One maintains that because the Services Agreement does not expressly address important conditions such as Penske's promised transaction volumes, parol evidence may be considered in interpreting the scope of the parties' agreement.

Level One asserts that the parties consistently contemplated that Penske would fully implement Epay, for all of its transactions, customers and carriers.

Level One cites various oral and written communications between the parties in support of the Volume Claims. In particular, Level One references several emails which the parties exchanged in December 2008 regarding projected volumes. Penske responds that the communications cited by Level One, if admissible, did not amend the Services Agreement and would only serve to confirm that Penske never made any enforceable promise that would support any of the Volume Claims. Penske argues that Level One bases its assertions on self-serving declarations and cites testimony by Level One's corporate representatives in which they allegedly admitted there was no written promise concerning volumes.

The emails and other communications cited by Level One in support of the Volume Claims are extrinsic evidence that cannot be used to modify or interpret the terms of the Services Agreement. Moreover, regardless of the scope of the disputed terms of the Services Agreement, Level One has not shown sufficient evidence of any additional binding contractual terms between the parties. Even if I did consider extrinsic evidence here, Level One has not demonstrated how Penske made any enforceable contractual promise concerning transaction volumes. Level One has failed to point to any document besides the Services Agreement which would constitute an enforceable contract. As a result, Level One has failed to create a genuine issue of material fact in favor of the Volume Claims.

Additionally, the statue of frauds precludes enforcement of the Volume Claims. Mo. Rev. Stat. § 432.010 requires a contract that is not performable within a year to be in writing and signed by the parties. To satisfy the statue of frauds, Level One would need to provide a writing demonstrating the existence of an agreement between the parties and setting forth essential terms, such as identity of the parties, the subject matter, the price, and consideration. See Bayless Bldg. Materials Co. v. Peerless Land Co., 509 S.W.2d 206, 210 (Mo. Ct. App. 1974). Under Missouri law, a contract can be inferred from several different writings only if the writings "in combination supply the essential terms" of the agreement. Vess Beverages, Inc. v. Paddington Corp., 941 F.2d 651, 654 (8th Cir.1991) (citations omitted) (noting that the documents constituting the contract must be signed, or, if only one document is signed, the others must be significantly related to it.). Here, the statue of frauds applies to the breach of contract claims because the Services Agreement does not include the alleged promises concerning customer transaction volumes, and the alleged promises would have constituted an essential contract term. Nor can the proposed terms be shown by extrinsic evidence. The 2008 emails and other documents cited by Level One cannot constitute an enforceable contract because they do not expressly contain the essential alleged volume

promises, the alleged contract would not be performable within a year, and the emails are not signed.[4]

Level One fails to present a genuine issue of material fact with respect to the Volume Claims. The written Services Agreement governs the parties' business relationship. Level One fails to demonstrate that Penske breached any term of this contract related to transaction volumes. Level One further fails to demonstrate that the parties entered into any other enforceable contract with the alleged terms. As a result, I will grant summary judgment in Penske's favor on the breach of contract claim with respect to the Volume Claims, as enumerated in subparagraphs 101(a), 101(b), 101(c), and 101(g) of Count I of the SAC.

  b. *Counts II and III: Fraud and Negligent Misrepresentation*

Level One brings separate counts for fraud and negligent misrepresentation. Because the parties apply the same arguments to both claims, I will discuss them together. Level One alleges that Penske fraudulently induced Level One to provide ongoing access to and knowledge of Epay, to expand Epay, and to enter into and not terminate the Services Agreement. Level One asserts that Penkse improperly

---

[4] Level One asserts that Paragraph 5 of the Services Agreement authorizes the signature element of the statue of frauds to be satisfied by electronic means, so the email communications could be used to amend the contract. However, under Paragraph 5, Penske simply agrees to receive electronic communications and no evidence shows that the parties had a pattern of entering into contracts electronically.

12

benefited from the services provided and costs incurred by Level One in enabling Penske's Epay access. For the reasons that follow, I will grant summary judgment in Penske's favor as a matter of law with respect to the fraud and negligent misrepresentation claims.

Penske asserts that the law-of-the-case doctrine precludes Level One's misrepresentation claims. I previously dismissed Level One's initial fraud in the inducement and negligent misrepresentation claims with prejudice as preempted by the Missouri Trade Secrets Act ("MUTSA"). See Doc. [25]; Mo. Rev. Stat. § 417.450, *et seq*. I previously dismissed Level One's initial fraud claim without prejudice for failure to meet the heightened particularity pleading requirement for fraud under Fed. R. Civ. P. 9(b). See Doc. [25]. Under the law-of-the-case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case." Maxfield v. Cintas Corp., No. 2, 487 F.3d 1132, 1335 (8th Cir. 2007) (internal quotation omitted). Courts will "consider a previously decided issue under the law-of-the-case doctrine only if substantially different evidence is subsequently introduced or the decision is clearly erroneous and works manifest injustice." Id. The MUTSA "displace[s] conflicting tort, restitutionary, and other laws . . . providing civil remedies for misappropriation of a trade secret." Mo.Rev.Stat. § 417.463.1. "The crucial

13

question is whether 'the claims are no more than a restatement of the same operative facts' that formed the basis of the plaintiff's statutory claim for trade secret appropriation." Secure Energy, Inc. v. Coal Synthetics, LLC, No. 4:08CV1719 JCH, 2010 WL 1691454, at *2 (E.D. Mo. Apr. 27, 2010) (internal citations omitted). Penske asserts that Level One now impermissibly attempts to re-litigate the previously dismissed fraud in the inducement and negligent misrepresentation claims, which remain preempted by MUTSA. Level One argues that law-of-the-case doctrine does not apply since I did not previously dismiss the pending fraud claim as preempted by MUTSA and because Level One allegedly raises new issues concerning transaction volumes and the transition of customers.

In its initial complaint, Level One presented issues including Penske's alleged taking and use of Level One's trade secrets, transaction volumes, and customer transitions. See Doc. [2]. Level One's remaining MUTSA claim under Count V of the SAC continues to encompass these issues. See Doc. [99]. Level One provides some additional factual detail in the SAC, but the primary substance of the restated fraud and negligent misrepresentation counts remains substantially similar to and repetitive of the claims that I previously dismissed based on the initial complaint – claims that Penske fraudulently induced Level One to enter into and continue their business relationship, enabling Penske to misappropriate Epay-

related trade secrets. Although I allowed Level One leave to amend its fraud claim, the new allegations are insufficiently distinctive from the prior fraud in the inducement and negligent misrepresentation claims. To the extent that Level One allegedly presents any new or different details with respect to its fraud and negligent misrepresentation counts, its arguments remain preempted by MUTSA. As a result, I will grant summary judgment in Penske's favor on the fraud and negligent misrepresentation claims.

    c. *Count IV: Good Faith and Fair Dealing*

Level One asserts that Penske breached its implied duty of good faith and fair dealing by failing to use Epay for customer transactions as promised and impermissibly using Epay to develop its own POPS system, but fails to present a genuine issue of material fact supporting such a breach. For the reasons that follow, I will grant summary judgment in Penske's favor as a matter of law with respect to the good faith and fair dealing claim.

"In Missouri, all contracts have an implied covenant of good faith and fair dealing." Lucero v. Curators of Univ. of Missouri, 400 S.W.3d 1, 9 (Mo. Ct. App. 2013) (citation omitted). The covenant encompasses "an obligation imposed by law to prevent opportunistic behavior, that is, the exploitation of changing economic conditions to ensure gains in excess of those reasonably expected at the

time of contracting." Spencer Reed Group, Inc. v. Pickett, 163 S.W.3d 570, 574 (Mo. Ct. App. 2005). "[T]he plaintiff must show that the party exercised its discretion 'in such a manner as to evade the spirit of the transaction or so as to deny [the other party] the expected benefit of the contract.'" BJC Health System v. Columbia Cas. Co., 478 F.3d 908, 914 (8th Cir. 2007) (quoting Mo. Consol. Health Care Plan v. Cmty. Health Plan, 81 S.W.3d 34, 45 (Mo. Ct. App. 2002)) (alterations in original). However, the "implied covenant will not...be imposed where the parties expressly address the matter at issue in their contract." State v. Nationwide Life Ins. Co., 340 S.W.3d 161, 194 (Mo. Ct. App. 2011). The covenant acts as a "gap filler" for unforeseen consequences, but "cannot give rise to new obligations not otherwise contained in a contract's express terms." Stone Motor Co. v. General Motors Corp., 293 F.3d 456, 466 (8th Cir. 2002) (applying Missouri law).

In order to support its good faith and fair dealing claim, Level One would need to present some evidence demonstrating that Penske evaded the spirit of the parties' agreement or denied Level One the expected benefit of the contract. As discussed above with respect to the Volume Claims, the Services Agreement, as amended, is the controlling contract. Level One asserts that Penske is liable for contravening the purpose of the parties' agreement and failing to satisfy Level

16

One's reasonable expectations. In particular, Level One argues that the purpose of the parties' agreement was to grant access to Penske to use Epay for all of its customer transactions and to compensate Level One for that use. Level One generally references certain representations made by Penske representatives and the parties' understanding, but does not point to any specific supportive piece of evidence demonstrating how Penske evaded the spirit of the Services Agreement or denied Level One any expected benefit, such as expressly contracted-for transaction fees. I cannot read new terms into the Services Agreement. Moreover, Level One does not connect Penske's alleged actions and representations concerning POPS development to the Services Agreement or any other contract between the parties. Level One did not present a genuine issue of material fact in favor of its good faith and fair dealing claim. As a result, I will grant summary judgment in Penske's favor with respect to this claim.

### d. Count VI: Unjust Enrichment

Level One pleads unjust enrichment as an alternative theory of liability, asserting that Penske was unjustly enriched by its alleged misconduct, including using Level One's Epay system to develop its copycat POPS program. For the reasons that follow, I decline to grant summary judgment in Penske's favor on the unjust enrichment claim.

17

In order to prevail on an unjust enrichment claim, a plaintiff must establish: "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention of the benefit under such circumstances that it would be inequitable for defendant to retain the benefit without paying the value thereof." Graves v. Berkowitz, 15 S.W. 3d 59, 61 (Mo. Ct. App. 2000) (citation omitted). Level One asserts that Penske obtained substantial profits and an enhanced reputation as a result of its actions and it would be unjust to allow Penske to retain these benefits. Penske asserts that an express contract, i.e., the Services Agreement, governs the subject matter of recovery sought by Level One's unjust enrichment claim, so recovery should not be available under this theory. See, e.g., R & R Land Dev., L.L.C. v. Am. Freightways, Inc., 389 S.W.3d 234, 243 (Mo.Ct.App.2012) ("[I]f the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract."). Level One argues that the contractual subject matter does not fully and expressly control the subject matter and damages at issue. Viewing the facts in the light most favorable to Level One, the nonmoving party, I decline to dismiss the unjust enrichment claim. Level One's remaining claims relating to POPS development are not before me here. Although recovery would

most likely not ultimately be allowed under both a POPS breach of contract claim and the unjust enrichment claim, Level One's unjust enrichment claim survives.

For the foregoing reasons, and based upon the record before me, I conclude that Penske's Motion for Partial Summary Judgment shall be granted in part and denied in part.[5] Level One shall have leave to amend its complaint in order to remove the dismissed claims from the complaint.

Accordingly,

**IT IS HEREBY ORDERED** that Penske's Motion for Partial Summary Judgment [130] is **GRANTED** in part and **DENIED** in part. Subparagraphs 101(a), 101(b), 101(c), and 101(g) of Count I of Level One's Second Amended Complaint are dismissed with prejudice. Counts II, III, and IV of Level One's Second Amended Complaint are dismissed with prejudice in their entirety.

**IT IS FURTHER ORDERED** that Level One shall file an amended

---

[5] I note that Penske filed a separate Motion for Summary Judgment on Counts I, II, III, IV, and VI [185] (the "Second Summary Judgment Motion"), which has not been fully briefed by the parties. Under the Second Summary Judgment Motion, Penske moves for summary judgment on same claims that it challenges here. When I rule on the Second Summary Judgment Motion, I will deny Penske's request for summary judgment as to Counts II, III, and IV as moot. As a result, the parties should limit their responsive briefing on the Second Summary Judgment Motion to Level One's remaining claims under Counts I and VI of the SAC.

complaint no later than **February 23, 2018**.

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 25th day of January, 2018.